525 A.2d 377

**John D. CLARK and Helen A. Clark, Trustees Ad Litem and John D. Clark, Administrator of the Estate of Sharon A. Clark, Deceased, Appellees,**

v.

**Oscar HOERNER, M.D. and Harrisburg Hospital, Appellants.**

Superior Court of Pennsylvania.

Argued June 24, 1986.

Filed April 2, 1987.

Reargument Denied May 22, 1987.

590

James W. Evans, Harrisburg, for appellants.

Alan Schwartz, Philadelphia, for appellees.

Before WIEAND, BECK and WATKINS, JJ.

WIEAND, Judge:

Sharon Clark died on January 1, 1981. The cause of death was pneumonia. Her parents filed wrongful death and survival actions against Dr. Oscar Hoerner and his employer, the Harrisburg Hospital, alleging that Hoerner had failed to detect and correctly diagnose Sharon's condition in adequate time to save her life.

The evidence offered at trial showed that Sharon had been examined for the first time by Dr. Hoerner on December 26, 1980. He diagnosed the malady of the fifteen year old girl as influenza and prescribed antihistamines and Tylenol. He gave Sharon permission to travel with her parents to New York. Dr. Hoerner saw Sharon a second time on December 29, when she complained of a sore throat, a swelling of the cervical glands, chest pains and a general malaise. He refused a request for an antibiotic. He again diagnosed Sharon's condition as the flu and prescribed medicine for the sore throat. He also performed a strep screen for throat bacteria which was negative. However, he took no x-rays. Sharon and her mother were instructed to call Dr. Hoerner if Sharon's condition became worse. However, Sharon's parents were dissatisfied with Dr. Hoerner's services and decided that they would not return.

Sharon's condition did become worse. At or about 8:00 p.m. on December 29, Sharon began vomiting blood. Ice was applied to her throat during the night. At 8:30 a.m. on December 30, Sharon's mother took her to the emergency room at Holy Spirit Hospital. A chest x-ray disclosed a rapidly progressing, fulminating pneumonia of the right lung. Sharon was admitted to the hospital, and antibiotics were administered. When Sharon suffered respiratory failure and kidney dysfunction, she was transferred to the Harrisburg Hospital, where she died. Dr. Sullivan, who treated her at both hospitals, diagnosed her condition and

testified that it was a rare and rapidly progressive pulmonary disease not often seen in the young.

A jury awarded damages of $650,000.00 against both defendants. The trial court added delay damages; post-trial motions were denied, and judgment was entered on the molded verdict. On appeal, Dr. Hoerner and Harrisburg Hospital contend: (1) that the evidence failed to establish a causal connection between the failure to make an immediate diagnosis and Sharon's death; (2) that the trial court erred when it declined to instruct the jury regarding the possible negligence of Sharon's parents; (3) that the trial court should have granted a motion for mistrial after an outburst by Sharon's mother while being cross-examined; and (4) that the trial court erred by allowing appellee-plaintiffs to call in rebuttal an expert witness not previously disclosed. Although we perceive no merit in defendant-appellants' first three arguments, we find their fourth and final contention to be well taken. The trial court abused its discretion when it permitted plaintiff-appellees to call a surprise expert witness, whose identity had not previously been disclosed. Accordingly, we vacate the judgment entered for plaintiff-appellees and remand for a new trial.

■ Although the medical testimony was in dispute, there was expert testimony attributing negligence to Dr. Hoerner because he had not ordered Sharon to rest following her first visit to the doctor's office and also because he had failed to use available diagnostic techniques, with a resulting erroneous diagnosis and treatment, on December 29. One of the experts called by the plaintiff-appellees, Dr. Hymen Kanoff, testified that the sooner Sharon had been properly diagnosed and treated, "the better the chances she had of survival." Another expert, Dr. Barry Singer, testified that if Sharon had been correctly diagnosed and treated on December 29, her chances of survival would have been "much better." Dr. Atkinson, who was the surprise witness, gave similar testimony. However, none of the experts were willing to say with reasonable medical certainty that Sharon's life could have been saved if Dr. Hoerner had

diagnosed and correctly treated her when she visited his office. Appellants contend that this was insufficient as a matter of law to establish that Dr. Hoerner's failure to diagnose and properly treat Sharon on the occasions when he saw her was the cause of her death.

A similar question was presented to the Supreme Court of Pennsylvania in *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978). The Court held:

> Such cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person may be held liable. Nevertheless, in order that an actor is not completely insulated because of uncertainties as to the consequences of his negligent conduct, Section 323(a) [of the Restatement (Second) of Torts] tacitly acknowledges this difficulty and permits the issue to go to the jury upon a less than normal threshold of proof. The Fourth Circuit in a case similar to the one at bar, has well stated the justification for this deviation from the normal requirements of proof. In *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1966), the court stated:
>
>> "When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendants mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly."
>
> We agree with this statement of the law and hold that *once a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which Section 323(a) applies, have increased the risk of harm to another,*

*such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.*

In light of our interpretation of Section 323(a), it follows that where medical causation is a factor in a case coming within that Section, it is not necessary that the plaintiff introduce medical evidence—in addition to that already adduced to prove defendant's conduct increased the risk of harm—to establish that the negligence asserted resulted in plaintiff's injury. Rather, once the jury is apprised of the likelihood that defendant's conduct resulted in plaintiff's harm, that Section leaves to the jury, and not the medical expert, the task of balancing probabilities. In so saying we do not intend to undermine the well-established standard of "reasonable degree of medical certainty" as the accepted norm for medical opinions on causation. But we think it would be unreasonable and unrealistic in this type of case to expect a physician to state with a "reasonable degree of medical certainty" what might have happened when the law (Section 323(a)) recognizes the contingencies involved. See generally D. Danner and E. Segall, Mediocolegal Causation: A Source of Professional Misunderstanding, 3 Am.J.L. & Med. 303 (1978). *Where there is at issue the adequacy of medical services rendered in a fact situation to which Section 323(a) applies, therefore, a prima facie case of liability is established where expert medical testimony is presented to the effect that defendant's conduct did, with a reasonable degree of medical certainty, increase the risk that the harm sustained by plaintiff would occur.*

*Id.*, 481 Pa. at 271–273, 392 A.2d at 1287–1289 (footnotes omitted). In the instant case, the causation issue was properly submitted to the jury. Appellants were not entitled to judgment n.o.v.

██ Defendant-appellants contended in support of their motion for a new trial that the court had erred by refusing to instruct the jury regarding the possible negligence of Sharon and her parents in failing to follow Dr. Hoerner's instructions. Our review of the record confirms the trial court's response that "there was absolutely no evidence to support a charge to the jury on Sharon Clark's contributory negligence." Trial court opinion, p. 16. Similarly, there was insufficient evidence to require a jury to determine whether the parents had been negligent in a way which contributed to their daughter's death. Indeed, as the trial court observed, the parents had not been joined as parties in the survival action [1] and, in response to plaintiff's interrogatories, the defense had denied that they would contend that another person or persons had been responsible for Sharon's death.

During the cross-examination of Sharon's mother, the following colloquy took place:

Q. And you didn't call him [Dr. Hoerner] when you first saw the blood?

[Mrs. Clark]

A. It was just a little streak of blood, sir. It was nothing to alarm anybody. I have seen it before on different people, myself.

Q. But she threw up—

A. If Sharon threw up a clot or if Sharon—as soon as I saw any kind of significant amount of blood, that's when we were gone to the hospital. *I think you are trying to infer I sat there and watched her bleed and did nothing and I didn't do that.* I wish to God she did, then I would have had her in the hospital sooner and she might be alive now. (Tr. 538–539; R. 501a; Sup.R. 502b.) (Emphasis added.)

---

1. Joinder is necessary in order to raise the defense of the parent's contributory negligence in a survival action. See: *Frankel v. Burke's Excavating, Inc.,* 223 F.Supp. 945 (E.D.Pa.1963). See also: *Fisher v. Dye,* 386 Pa. 141, 125 A.2d 472 (1956); *Minkin v. Minkin,* 336 Pa. 49, 7 A.2d 461 (1939).

The witness' response, we are told, was emotionally delivered in a loud voice as the witness rose from her seat. The trial court recessed the trial to permit the witness to compose herself, but denied a defense motion for mistrial. Appellants contend that it was error to deny the motion for mistrial.

A trial judge is in the best position to observe the atmosphere in which a trial is being conducted and to determine whether a statement in the heat of trial by counsel or a witness has had a prejudicial effect on the jury. Whether to grant or deny a motion for mistrial, therefore, must necessarily rest primarily in the discretion of the trial court. *Narciso v. Mauch Chunk Township*, 369 Pa. 549, 552, 87 A.2d 233, 234 (1952). Absent a clear abuse of that discretion, an appellate court will not disturb the trial court's ruling. *Abrams v. Philadelphia Suburban Transportation Co.*, 438 Pa. 115, 119, 264 A.2d 702, 704 (1970); *Speer v. Barry*, 349 Pa.Super. 365, 372, 503 A.2d 409, 413 (1985). Whether a court has abused its discretion in refusing a motion for mistrial must be determined by the circumstances under which the statement was made and the precautions taken to prevent its having a prejudicial effect on the jury. *Martin v. Philadelphia Suburban Transportation Co.*, 435 Pa. 391, 394, 257 A.2d 535, 537 (1969).

The remarks of the witness in the instant case were not so inflammatory or prejudicial as to prevent a fair trial. Cf. *Commonwealth v. Gardner*, 490 Pa. 421, 416 A.2d 1007 (1980) (no abuse of discretion in denying mistrial where family of victim broke down emotionally in front of jury); *Commonwealth v. Gartner*, 475 Pa. 512, 381 A.2d 114 (1977) (in-court emotional outburst by victim's mother did not require mistrial). We conclude, therefore, that it was not an abuse of discretion to deny the motion for mistrial. Moreover, the trial court cautioned the jury "to decide the case without any emotional considerations ... to decide it based on the testimony and the testimony alone."

The final issue is the most difficult and also the most troublesome. On the eighth day of trial, after all parties

had completed their cases in chief, the plaintiffs called a surprise witness. Plaintiffs' prior witnesses had been "specialists in the areas of general practice and internal medicine—not pulmonology." Appellees' Brief, p. 21. Now, however, they produced Dr. William Atkinson, the Chief of Pulmonary Medicine at Presbyterian Hospital, University of Pennsylvania. Dr. Atkinson had not been identified as a witness prior to trial. When it became known on the seventh day of trial that plaintiff-appellees intended to call a witness on rebuttal, defense counsel's request that the identity of the witness be disclosed was refused. When Dr. Atkinson appeared on the eighth day of trial, defense counsel objected to his being allowed to testify because the witness had not previously been disclosed. When the trial court decided to allow the witness to testify, defense counsel requested a continuance to ascertain the nature of the witness' testimony. The motion for continuance was denied by the trial court. When counsel asked for the witness' curriculum vitae, plaintiffs' counsel responded that he didn't have it.

Dr. Atkinson testified that he had reviewed the hospital records, the physicians' notes, the autopsy report and the reports of other physicians. He was then asked to give his opinion as to the cause of death and testified that death had not been caused by viral pneumonia, as the defense experts had concluded, but by bacterial pneumonia. The witness was then asked a hypothetical question and responded that Dr. Hoerner's failure to order an x-ray on December 29 was not consistent with the recognized standard of medical care in the community. He also testified, as we have observed, that Sharon's chances of survival had been adversely affected by the delay in diagnosing correctly her condition.

Pa.R.C.P. 4003.5(b) provides as follows:

(b) If the identity of an expert witness is not disclosed in compliance with subdivision (a)(1) of this rule, he shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenu-

ating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

Pa.R.C.P. 4019(i) also provides:

(i) A witness whose identity has not been revealed as provided in this chapter shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

"The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits. When expert testimony is involved, it is even more crucial that surprise be prevented, since the attorneys will not have the requisite knowledge of the subject on which to effectively rebut unexpected testimony. By allowing for early identity of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of experience on the spot. Thus, the rule serves as more than a procedural technicality; it provides a shield to prevent the unfair advantage of having a surprise witness testify." *Sindler v. Goldman,* 309 Pa.Super. 7, 12, 454 A.2d 1054, 1056 (1982).

Appellees contend that the discovery rules apply only to witnesses who are called to testify by a party during his or her case in chief and do not preclude the testimony of expert witnesses, such as Dr. Atkinson, when they are called in rebuttal. We disagree. The rules themselves do not make the distinction urged by appellees, and to amend the rules to so provide would, in practice, reintroduce the trial by ambush which the rules were intended to prevent. The language of the rules is adequate to protect a party who has been surprised by unexpected evidence in his opponent's case in chief. If the failure to anticipate an opponent's evidence is beyond the control of a party, the court may treat the same as an extenuating circumstance and permit a previously undisclosed witness to be called in

rebuttal. The rules must be interpreted to prevent surprise and unfairness and not as devices for excluding relevant, rebuttal evidence. "Where there is ambiguity, the rule will be construed ... to secure a just determination of the action. This will more likely be achieved by receiving relevant evidence than by excluding it." *Feingold v. Southeastern Pennsylvania Transportation Co.*, 339 Pa. Super. 15, 27, 488 A.2d 284, 291 (1985) (interpreting an analogous local rule), *aff'd*, 512 Pa. 567, 517 A.2d 1270 (1986). If necessary to assure a fair trial on the merits, a trial court may grant a brief continuance or take other steps to achieve this objective.

■ Even if we were to accept appellees' position that Rules 4003.5(b) and 4019(i) have no application to rebuttal witnesses, such a determination would be unavailing to appellees here because the record clearly demonstrates that Dr. Atkinson was not a rebuttal witness. " 'Rebuttal evidence' is defined in Black's Law Dictionary (5th ed. 1979) as '[e]vidence given to explain, repel, counteract, or disprove facts [as opposed to opinions] given in evidence by the adverse party." *Feingold v. Southeastern Pennsylvania Transportation Co.*, *supra* 339 Pa.Super. at 26, 488 A.2d at 290. "A party cannot, as a matter of right, offer in rebuttal evidence which is properly part of his case in chief, but will be confined to matters requiring explanation and to answering new matter introduced by his opponent." 2 Henry, *Pennsylvania Evidence*, § 730 (4th ed. 1953), quoted in *Klyman v. Southeastern Pennsylvania Transportation Authority*, 331 Pa.Super. 172, 179, 480 A.2d 299, 303 (1984). See: 75 Am.Jur.2d *Trial* § 151. Instantly, plaintiff-appellees represented that Dr. Atkinson was being called to rebut the testimonies of defense experts concerning the cause of Sharon's death. This he did. However, he went considerably further when he opined, over repeated defense objections, that "a general practitioner would have, in comporting with the reasonable standard of care, been required to take chest x-rays, a blood culture and ... other tests," N.T. at 1133–1134; R.R. at 979a–980a, and that, based upon

a reasonable degree of medical certainty, "Dr. Hoerner's failure to order an x-ray ... [had] increased the risk of harm and death to Sharon Clark...." N.T. at 1134; R.R. at 980a. Such testimony, bearing as it did upon the ultimate issues of whether Dr. Hoerner had been negligent and, if so, whether his negligence had been a substantial factor in bringing about the decedent's death, should have been presented during the plaintiffs' case in chief. Dr. Atkinson could not have been so called, however, because he had not been identified as an expert witness prior to trial. Should appellees now be allowed to circumvent the discovery rules by the expedient of characterizing Dr. Atkinson as a rebuttal witness? We think not. "We cannot allow a party to circumvent the valid purposes of the discovery rules by late retention of expert witnesses which the party then excuses under the guise of ignorance or surprise regarding [the] opposing party's case." *Kaminski v. Employers Mutual Casualty Co.*, 338 Pa.Super. 400, 416, 487 A.2d 1340, 1349 (1985). To permit the rule to be avoided under the guise of calling undisclosed expert witnesses in rebuttal and in the absence of "extenuating circumstances beyond the control of the defaulting party" would violate both the language and the spirit of the rule.

No extenuating circumstances existed in the instant case. There was no evidence to indicate that Dr. Atkinson could not have been identified prior to trial or that he was unavailable to testify during the presentation of the plaintiffs' case in chief. Nor is there evidence that appellees were surprised by the testimony of the defense experts such that the need for Dr. Atkinson's testimony could not have been anticipated. The identities of all defense experts called at trial, their backgrounds, and the substantive aspects of their testimonies had been supplied to the plaintiff-appellees before trial in answers to interrogatories.

Appellees argue that the need for Dr. Atkinson's testimony became apparent for the first time during the presentation of defense evidence when a defense witness testified for the first time that, according to a notation he had made

on the decedent's medical chart, she may have been experiencing bouts of rapid breathing prior to her examination by Dr. Hoerner on December 29, 1980. This contention, however, is belied by the record. The chart, from which the witness testified, had been the subject of pre-trial discovery and had been available to plaintiffs' counsel before trial began. The notation regarding rapid breathing was there to be seen by counsel and plaintiffs' experts. It did not come to light for the first time during the presentation of defense evidence.

Despite the mandatory language of Rules 4003.5(b) and 4019(i), it has been held that a trial court "must balance the facts and circumstances of each case to determine the prejudice to each party." *Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 573, 517 A.2d 1270, 1273 (1986). Appellees argue, therefore, that by balancing the facts the trial court could determine that appellants would not be prejudiced by allowing Dr. Atkinson to testify. We reject this argument.

Dr. Atkinson was contacted by plaintiffs' counsel for the first time during the trial. He was requested to review hospital records, physicians' notes, the autopsy report and reports of several physicians which had been prepared in connection with the litigation. He also reviewed a hypothetical question which counsel submitted to him. His identity, however, was not disclosed until immediately prior to his giving testimony. On the seventh day of trial, plaintiffs' counsel refused a request to identify the potential rebuttal witness to whom he had referred, asserting a lack of certainty as to the witness' availability. Therefore, opposing counsel was not aware of Dr. Atkinson's identity until immediately before he was called as a witness on the eighth day of trial. Dr. Atkinson was offered to rebut "whether or not the young lady died as a result of a viral pneumonia or bacterial pneumonia." The record discloses the following:

MR. SCHWARTZ: The significance of certain complaints which have been testified to by the defense testi-

fying in connection with whether or not based on the symptomatology we have, whether a chest x-ray should have been done, these are things that have been put in the defense repeatedly three times. Your Honor, defense had three experts, plaintiff only had two in this case in chief.

THE COURT: That wouldn't make any difference.

MR. SCHWARTZ: But this is rebuttal, Your Honor.

THE COURT: I think he is entitled to rebuttal.

MR. EVANS: He may be not in this fashion, that is not proper rebuttal to put another expert in here unknown to me. I move for a continuance of the trial of this case to have a deposition without the hearing of the jury.

THE COURT: I will deny that and grant you an exception.

MR. EVANS: May I have some information who this man is, a curriculum vitae?

MR. SCHWARTZ: Your Honor, he is a pulmonary specialist from Presbyterian Hospital University of Pennsylvania.

THE COURT: Why didn't you give him your vitae?

MR. SCHWARTZ: I don't have it, sir.

THE COURT: I'm simply not going to get myself into a case that is taking a better part of two weeks and just let it get out of control at this stage.

To argue, as appellees do, that appellants were not prejudiced because appellant should have anticipated that plaintiff-appellees would call on rebuttal a previously undisclosed specialist in pulmonary medicine is not realistic. The witness, who injected a new dimension into the trial both by his specialty and by his testimony regarding the cause of death, was called for the first time after the substantive issues had been fully tried and the parties had rested their cases in chief. Appellants' counsel had no prior notice of the substance of the witness' testimony. Neither did he have notice or even an opportunity to learn the curriculum vitae of the witness whom plaintiff-appellees now offered as a pulmonary expert. When defense counsel requested a

delay to determine the qualifications of the witness and the substance of his testimony, the request was denied by the court. On this record the conclusion is inescapable that appellants' trial counsel was ambushed by a surprise witness.[2] We hold, therefore, that the trial court abused its discretion when, without affording opposing counsel any opportunity to ascertain the qualifications of the surprise witness or the nature of his testimony, the court permitted appellees to call a witness who had not been disclosed prior to trial as required by rules of discovery. Trial by ambush is no longer to be countenanced. See: *Nissley v. Pennsylvania Railroad Co.*, 435 Pa. 503, 259 A.2d 451 (1969), *cert. denied*, 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970) (new trial granted because trial court improperly allowed testimony of expert medical witness whose identity had not been disclosed in answer to interrogatory); *Moore v. Howard P. Foley Co.*, 235 Pa.Super. 310, 340 A.2d 519 (1975) (new trial granted where trial court erroneously allowed doctor to testify as expert witness where identity of expert had not been disclosed in answer to interrogatory and opponent did not learn of it until first day of trial). See also: *Sindler v. Goldman, supra; McClain v. Carney*, 19 D. & C.3d 527 (Wyoming Cty.1981); *Philadelphia Electric Co. v. Nuclear Energy Liability—Property Insurance Association*, 10 D. & C.3d 340 (Phila.Cty.1979). Compare: *Kemp v. Qualls*, 326 Pa.Super. 319, 473 A.2d 1369 (1984).

Reversed and remanded for a new trial. Jurisdiction is not retained.

BECK, J., files a concurring and dissenting opinion.

BECK, Judge, concurring and dissenting:

I concur in the majority's resolution of the first three issues. I respectfully dissent from the majority's conclu-

---

**2.** Writing in dissent in *Kaminski*, Judge Del Sole suggested that "[i]f Appellant were truly prejudiced or surprised, it could have cured the prejudice by a continuance, which it did not request." *Kaminski v. Employers Mutual Casualty Co., supra* 338 Pa.Super. at 421, 487 A.2d at 1352 (Del Sole, J., dissenting). In this case, appellants requested a continuance to determine the substance of Dr. Atkinson's testimony, but the request was denied by the trial court.

sion that the trial court abused its discretion when it permitted the rebuttal testimony of plaintiffs'-appellees' surprise expert witness.

In its case in chief, appellees attempted to establish that complications of bacterial pneumonia caused Sharon's death. Appellees' case was based in part on the theory that defendant-appellant, Dr. Hoerner, acted negligently in failing to order an x-ray when he examined Sharon on December 29, 1980. Appellees argue that the x-ray would have resulted in an earlier diagnosis of bacterial pneumonia, earlier antibiotic treatment, and increased chances of Sharon's survival. Appellees' argument is based on the premise that bacterial pneumonia will respond to a course of treatment with antibiotics.

In their case in chief appellants presented conflicting evidence on causes of death. One of appellants' experts agreed with appellees that Sharon was suffering from bacterial pneumonia while other experts concluded that Sharon was suffering from a mixed variety of pneumonia, bacterial and viral. In addition, under cross-examination, appellants' witness, Dr. Hewlett, gave an unanticipated interpretation of Sharon's medical chart. Dr. Hewlett was the emergency room physician on duty when Sharon was admitted to the hospital on December 30, the day after Dr. Hoerner examined her. Dr. Hewlett explained the meaning of a notation he made that day on Sharon's chart about her medical history. The phrase in question was, "rapid breathing, and fever for several days." In cross examination Dr. Hewlett testified that "several days" was intended to modify the symptom of "rapid breathing" as well as "fever." He further stated that "several days" meant at least two days. Although the notation on the chart was available to appellees during discovery, appellees could not reasonably have been expected to anticipate Dr. Hewlett's unique interpretation of the notation. The trial court aptly described this interpretation of the history as "novel," and "a diagnostically significant fact not previously discovered." Until Dr. Hewlett's testimony, there was no evidence that Sharon had

been breathing rapidly on December 29, when Dr. Hoerner last examined her. Therefore, appellees' expert witnesses in the case in chief did not assess the effect of this symptom in their testimony.

It is noteworthy that during the case for the defense, Dr. Hoerner testified that if Sharon had been breathing rapidly when he had examined her on December 29, he would have ordered a chest x-ray. In other words, Dr. Hoerner and Dr. Hewlett agreed that the presence of rapid breathing on December 29, would have indicated the need for a chest x-ray, as the accepted standard of medical practice. In contrast to Dr. Hewlett, Dr. Hoerner denied the presence of rapid breathing on December 29. Differing from both Drs. Hoerner and Hewlett, appellants' other expert witnesses, Drs. Sullivan, Weitekamp and Bartlett, testified that they did not believe the standard of care required a chest x-ray on December 29.

With this background, I address the questions raised surrounding the rebuttal testimony of appellees' expert witness, Dr. G. William Atkinson. The record indicates appellees' counsel first discussed the facts of this case with Dr. Atkinson, a pulmonary specialist, on Friday, March 8, 1985, after Dr. Hewlett's testimony revealed that Sharon experienced rapid breathing on December 29. Dr. Atkinson received Sharon's medical records over the weekend, reviewed them, and discussed the case with appellees' counsel on Monday evening, March 11. That evening, appellees' counsel determined the need for Dr. Atkinson to present rebuttal testimony on Wednesday morning, March 13. On March 12, appellants learned appellees intended to call a rebuttal witness, requested further information about the rebuttal, and received none.

When Dr. Atkinson appeared in court on March 13, appellants requested a continuance which was denied. Appellees' attorney gave an offer of proof and identified the two issues Dr. Atkinson would address in rebuttal. Appellees' counsel placed Dr. Atkinson's qualifications on the record but did not provide appellants with his curriculum vitae.

Dr. Atkinson then testified as to the significance of Sharon's rapid breathing on December 29 and as to her cause of death.

## I.

The first issue Dr. Atkinson addressed in rebuttal was the significance of Sharon's rapid breathing of December 29. He responded to a hypothetical question which included evidence of Sharon's rapid breathing. He testified that the recognized standard of care in the medical community called for a chest x-ray on December 29, in the case of a patient exhibiting Sharon's symptoms, including rapid breathing.

I would find that this testimony was proper rebuttal.

Dr. Hoerner had denied that Sharon exhibited rapid breathing on December 29. Appellees were not aware of the possibility of Sharon's rapid breathing on December 29, until appellants' own witness, Dr. Hewlett, during appellants' case in chief revealed that the notation he made on Sharon's chart on December 30 meant that Sharon exhibited rapid breathing on December 29. Appellees did not know and could not reasonably have anticipated this interpretation until Dr. Hewlett's testimony. Therefore, Dr. Atkinson's testimony on this issue was proper rebuttal to impeach Dr. Hoerner as well as his supporting witnesses, Drs. Sullivan, Weitekamp and Bartlett.

Appellees' response to the new interpretation of the evidence was rebuttal as of right. A litigant may offer "rebuttal testimony, and where the evidence proposed goes to the impeachment of his opponent's witness, it is admissible as a matter of right." *Feingold v. Southeastern Pa. Transp. Auth.*, 512 Pa. 567, 576, 517 A.2d 1270, 1274 (1985) (citations omitted). In *Feingold*, our Supreme Court defines impeachment, in the context of rebuttal, as testimony of other witnesses whose version of the facts differ from that of the witness being impeached. *Id.* "For matters properly not evidential until the rebuttal, the proponent has

a right to put them in at that time, and they are therefore not subject to the discretionary exclusion of the trial court." *Flowers v. Green,* 420 Pa. 481, 484, 218 A.2d 219, 220 (1966) (citation omitted).

Generally, the decision whether to admit rebuttal testimony is within the discretion of the trial court. *McNair v. Weikers,* 300 Pa.Super. 379, 446 A.2d 905 (1982). Dr. Atkinson also explained an inconsistency in the testimony of appellants' expert witnesses as to the presence of rapid breathing and as to whether a chest x-ray was essential on December 29. Therefore, even if I were to conclude that Dr. Atkinson's testimony was not proper rebuttal as of right, I would have to find the court did not abuse its discretion in admitting the testimony.

## II.

The second issue Dr. Atkinson addressed in rebuttal was the cause of Sharon's death. He reinforced appellees' conclusion presented in their case in chief that the cause of death was bacterial pneumonia. Appellees urge that this was a proper subject for rebuttal because appellants' witnesses had muddied the waters in the case in chief by presenting conflicting causes of death. Even if appellees' assessment of appellants' case was accurate, appellees are not permitted as a matter of right to present testimony in rebuttal when such testimony was properly part of their case in chief. It is axiomatic that it is within the trial court's discretion to admit or exclude rebuttal testimony which could have been properly presented as part of appellees' case in chief. *Downey v. Weston,* 451 Pa. 259, 268–69, 301 A.2d 635, 641 (1973); *Klyman v. Southeastern Pa. Transp. Auth.,* 331 Pa.Super. 172, 179, 480 A.2d 299, 303 (1984).

I would not however, find an abuse of discretion. Rebuttal is proper as to matters that require explanation. *See Schoen v. Elsasser,* 315 Pa. 65, 172 A. 301 (1934). Appel-

lants had several eminent medical experts testify that the cause of death was not bacterial pneumonia. However, one of appellants' witnesses, Dr. Hewlett, as well as all of appellees' witnesses during the case in chief testified that bacterial pneumonia was the cause of death. Therefore, the court with a view to clarifying this conflicting testimony, did not abuse its discretion in permitting rebuttal.

## III.

Consideration must also be given to the consequences of appellees' counsel's withholding information about Dr. Atkinson's rebuttal testimony on March 12, and his calling the doctor as a surprise expert on March 13. Appellees argue their conduct was proper because appellees were under no legal obligation to name Dr. Atkinson on March 12. Appellees contend the discovery rules are not applicable to rebuttal experts.

Counsel's interpretation of the discovery rules was reasonable in light of the fact that the rules address trial preparation only. I, however, agree with the majority that the rules should be interpreted to prevent surprise and unfairness and would rule so prospectively. I would hold that in the future the discovery rules apply to rebuttal testimony insofar as possible. Pa.R.C.P. 4007.4(1) and 4003.5(a)(1)(a). Although often presentation of rebuttal evidence cannot be anticipated until the defense has presented its case, the plaintiff must anticipate it as soon as possible during defendant's presentation or after defendant has finished his presentation. Trial preparation does not cease with the commencement of trial.

Although I conclude that the trial court abused its discretion in not granting appellants' motion for a continuance, I find that the appellants were not prejudiced thereby. Rules 4003.5(b) and 4019(i), Pa.R.C.P., both recognize the need for the court to grant appropriate relief when a party fails to disclose the identity of a witness, even where the failure is

excusable. Appellants requested a continuance to ascertain the substance of Dr. Atkinson's testimony. Had the court granted the continuance, appellants would have discovered the nature of the testimony and Dr. Atkinson's qualifications. The continuance would have been an appropriate and effective means of curing any unfairness resulting from appellees' withholding information about the rebuttal witness until the last minute.

However, despite the court's refusal to grant a continuance, any unfairness that accrued to appellants was largely cured by appellees' offer of proof. Appellants' extensive cross-examination of Dr. Atkinson reveals counsel was commendably prepared despite the lack of a continuance. This was in part because Dr. Atkinson relied on Sharon's medical records, all of which were available to the appellants.

Dr. Atkinson was clearly qualified as a pulmonary specialist and appellees placed his qualifications on the record. Therefore while I do not condone appellees' action in not providing appellants with the identity and curriculum vitae of Dr. Atkinson, I cannot find that the court's failure to grant the continuance resulted in prejudicial error.

Furthermore, if appellants were prejudiced it would have been proper and appropriate for them to have requested permission for surrebuttal and for a continuance to prepare the surrebuttal after Dr. Atkinson had testified. I do not suggest that appellants' failure to request surrebuttal cures the impropriety of appellees' counsel's action or results in waiver of the issues related to the rebuttal testimony, but I believe this failure is an indication that the overall effect of the rebuttal testimony did not prejudice appellants.

The "trial court must balance the facts and circumstances of each case to determine the prejudice to each party." *Feingold,* 512 Pa. at 573, 517 A.2d at 1273. By balancing the facts, the trial court could properly determine that appellants were not prejudiced by the testimony of Dr. Atkinson. Accordingly, I would affirm.