J-A01033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GREGORY WIGGS AND SHIRLEY WIGGS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ENERGY COORDINATING AGENCY | : | |
| | : | No. 2436 EDA 2021 |
| Appellant | : | |

Appeal from the Judgment Entered October 26, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 181200491

BEFORE: LAZARUS, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY LAZARUS, J.:         **FILED MARCH 29, 2023**

Energy Coordinating Agency ("ECA") appeals from the judgment, entered in the Court of Common Pleas of Philadelphia County, after a jury rendered a verdict in favor of Appellee, Gregory Wiggs.[1] Upon careful review, we affirm.

The trial court set forth the facts of this case as follows:

[Wiggs] owns a home at 2817 West Montgomery Ave., Philadelphia[.] The property is a two-story house with a basement. [ECA] is a non-profit agency operating on various government funding to weatherize homes for low-income homeowners. [Wiggs] reached out to [ECA] for help in weatherizing his home in 2016. In 2016, [ECA] insulated [Wiggs'] roof cavity, rewired the attic, installed five windows, re-vented the central air conditioner to the outside, and air[-]sealed the

---

[1] Wiggs' wife, Shirley Wiggs, was named as a plaintiff in the initial complaint filed in this matter. However, in the amended complaint, which is the operative pleading, only Gregory Wiggs was named as plaintiff. It is unclear why ECA continued to name Shirley Wiggs as a party in its notice of appeal.

basement. During the weatherization process, [Wiggs] discussed concerns about his leaking roof with [ECA]. [ECA] was unable to repair the roof at that time.

[ECA] was later able to obtain funding that would allow the organization to do roof work. On July 31, 2017, [ECA] sent a work crew to [Wiggs'] home to address the roof leak. On that day, the crew of workmen opened the roof in four places to begin work. While the roof was open, a [three-]hour flash storm occurred. At the time, the workmen did not have tarps to cover the holes in the roof, and because of this oversight, [Wiggs] tried to mitigate the rain by putting plastic bins on the floor to catch water from the roof. Officers from [ECA] were contacted and informed that rain had entered [Wiggs'] home. However, they arrived at [Wiggs'] home only after the rain [had] stopped.

At a later time, Charles Graves, Chief Operating Officer for [ECA], and Steve Luxton, Executive Director for [ECA], did a walkthrough of [Wiggs'] home with [Wiggs]. Yet, [ECA] did not immediately do any restoration work to [Wiggs'] home. Consequently, rain continued to enter [Wiggs'] home through August 29, 2017. [Wiggs] recorded a video of rain entering his home in August 2017; the video was presented to the jury at trial.

During the first week of August 2017, [Wiggs] threw away numerous items that [had] sustained water damage from rain that entered through the holes in his roof. [Wiggs] also spoke with a contents estimator[,] Canio Pascale[,] to itemize a list of water-damaged property items. After itemizing his damaged items in a handwritten note, [Wiggs] reviewed and signed a property loss report verifying that all the listed items were damaged in the storm. Although the list was generally accurate, [Wiggs] and Pascale mistakenly included a few items on the list that were not lost. For example, the list included a dryer that [Wiggs] did not own.

A year after the flooding, [ECA] hired a contractor to finally repair the roof. However, other than the new roof, [Wiggs] never received any compensation for his water-damaged personal property. In fact, [ECA] failed to compensate [Wiggs] even after admitting [it] was negligent.

Trial Court Opinion, 6/29/22, at 4-6 (footnotes omitted).

Wiggs filed an amended complaint on January 16, 2019. EC filed an answer and new matter on May 14, 2019, and Wiggs filed a response to new matter on May 31, 2019. At Wiggs' request, on September 5, 2019, the trial court extended the discovery and case-management deadline by 60 days. ECA filed motions *in limine* to preclude evidence about mold and from Wiggs' structural damage and contents estimate experts. The court denied those motions; however, it limited Wiggs' testimony relating to the mold and its effects. Specifically, the court ruled that Wiggs could testify as to his observations of mold at the property, but he could not testify as to the mold's purported exacerbation of his health conditions. **See** N.T. Trial, 6/1/21, at 18 ("[THE COURT:] I can't prevent him from [] mentioning anything about mold. That goes to the heart of his property claim. However, if he tries to draw a causal connection between the mold and his exacerbation of his condition[,] that's a different story.").

A jury trial was held from June 1 to 3, 2021, at which the sole issue was damages, as ECA admitted liability. On June 3, 2021, the jury entered a verdict in favor of Wiggs in the amount of $225,000, which was subdivided into two categories: structural damage ($150,000) and contents ($75,000). On June 14, 2021, ECA filed post-trial motions for a new trial, judgment notwithstanding the verdict ("JNOV"), and remittitur to mold the jury's verdict. Wiggs filed an answer on June 24, 2021. The motions were denied by operation of law and, on October 26, 2021, Wiggs filed a praecipe to enter judgment on the verdict. ECA filed a timely notice of appeal, followed by a

court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. ECA raises the following claims for our review:

> 1. Did the trial court err in not granting a new trial on damages and/or [JNOV] in favor of [ECA] where [Wiggs] failed to produce a proper expert report from one of his testifying experts, failed to timely identify the expert[,] and failed to provide the expert's curriculum vitae, all in violation of multiple court orders?
>
> 2. Did the trial court commit an abuse of discretion and/or an error of law when it failed to strike the expert testimony of [Wiggs'] contents expert, Canio Pascale?
>
> 3. With respect to the jury's award for structural damages, which was in excess of the damages claim made by and proof submitted by [Wiggs], did the trial court err in not granting a motion for new trial or in not molding the verdict with respect to damages?
>
> 4. Did the trial court make multiple evidentiary errors[, warranting] the grant of a new trial?

Brief of Appellant, at 4 (unnecessary capitalization omitted; reordered for ease of disposition).

ECA's first two claims involve allegations of trial court error with respect to its admission, and failure to strike, the testimony of Wiggs' contents expert, Canio Pascale. In its first claim, ECA asserts that the court should have precluded Pascale's testimony because a "proper signed expert report was never produced, nor were verified [a]nswers to [i]nterrogatories." *Id.* at 13. Similarly, Wiggs did not produce a copy of Pascale's curriculum vitae ("CV"), as required by the court's case management order. ECA claims "there is no explanation other than bad faith on behalf of [Wiggs] in failing to identify [] Pascale as an expert witness, failing to provide a legitimate report[,] and

failing to provide his [CV]." *Id.* at 14. ECA asserts that it was "clearly and unquestionably prejudiced" by the court's decision to admit Pascale's testimony. *Id.* at 13.

In support of its claim, ECA relies on this Court's decision in ***Clark v. Hoerner***, 525 A.2d 377 (Pa. Super. 1987). That case involved a wrongful death and survival action related to the defendant physician's failure to diagnose the plaintiffs' decedent's pneumonia, from which she ultimately died. On the eighth day of trial, after all parties had concluded their cases-in-chief, the trial court allowed plaintiffs to present testimony on rebuttal of a "surprise witness" who had not been identified as a witness prior to trial. The trial court denied defense counsel's request for a continuance to determine the qualifications of the witness and the substance of his testimony. On appeal to this Court, the defendants/appellees claimed that the trial court erred in admitting the rebuttal testimony. This Court agreed, stating:

> The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits. When expert testimony is involved, it is even more crucial that surprise be prevented, since the attorneys will not have the requisite knowledge of the subject on which to effectively rebut unexpected testimony. By allowing for early identity of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of experience on the spot. Thus, the rule serves as more than a procedural technicality; it provides a shield to prevent the unfair advantage of having a surprise witness testify.

*Id.*, quoting ***Sindler v. Goldman***, 454 A.2d 1054, 1056 (Pa. Super. 1982). ECA is entitled to no relief.

The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. *In re Estate of Byerley*, 284 A.3d 1225, 1239 (Pa. Super. 2022). We may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. *Id.* To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Id.*

Pennsylvania Rule of Civil Procedure 4003.5 governs the discovery of expert testimony and requires the disclosure of the identity of expert witnesses, as well as the "substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Pa.R.C.P. 4003.5(a)(1)(A), (B).

> An expert witness whose identity is not disclosed in compliance with subdivision (a)(1) of this rule shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

Pa.R.C.P. 4003.5(b). *See also* Pa.R.C.P. 4019(i).

Pennsylvania Rule of Civil Procedure 4003.5 requires parties to timely submit their expert reports and confines the expert's testimony to the scope of those reports, to avoid unfair surprise. *See Woodard v. Chatterjee*, 827 A.2d 433, 445 (Pa. Super. 2003). In such situations, trial courts may exclude the offending testimony entirely or, in some cases permit the opposing party

to depose the witness during trial. ***Gregury v. Greguras***, 196 A.3d 619, 630–31 (Pa. Super. 2018) (en banc).

However, "[d]espite the mandatory language of Rules 4003.5(b) and 4019(i), it has been held that a trial court 'must balance the facts and circumstances of each case to determine the prejudice to each party.'" ***Clark v. Hoerner***, 525 A.2d 377, 383 (Pa. Super. 1987), quoting ***Feingold v. Southeastern Pennsylvania Transportation Authority***, 517 A.2d 1270, 1273 (Pa. 1986).

> "While the late disclosure of the identity or qualifications of an expert is to be condemned, the mere occurrence of such a circumstance does not *per se* create grounds for a new trial." ***Kemp v. Qualls***, [] 473 A.2d 1369, 1374 ([Pa. Super.] 1984) []. The preclusion of expert testimony is a drastic sanction which should not be applied unless the facts of a case make it absolutely necessary to do so. ***Id. See also Gill v. McGraw Electric Co.***, [] 399 A.2d 1095, 1102 ([Pa. Super.] 1979). "'[A]ssuming that a party has not acted in bad faith and has not misrepresented the existence of an expert expected to be called at trial, no sanction should be imposed unless the complaining party shows that he has been prejudiced from properly preparing his case for trial as a result of a dilatory disclosure.'" ***Kemp***[], *supra*, quoting ***Royster v. McGowen Ford, Inc.***, [] 439 A.2d 799, 804 ([Pa. Super.] 1982).

***Kearns by Kearns v. DeHaas***, 546 A.2d 1226, 1231 (Pa. Super. 1988). Where the objecting party is aware of the substance of the challenged testimony, there is no prejudice. ***See Feingold***, 517 A.2d at 1273 (no prejudice shown where appellant had access to medical records and knew what substance of expert medical testimony would be).

In **Gill v. McGraw Electric Co.**, 399 A.2d 1095 (Pa. Super. 1979), an en banc panel of this Court established the analytical framework within which to consider admission of previously undisclosed expert testimony. The **Gill** Court set forth four criteria relevant to such determination: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court, and (4) bad faith or willfulness in failing to comply with a pre-trial order limiting witnesses to be called to those named prior to trial. **Id.** at 1102. **See also Feingold**, 517 A.2d at 1273 (applying four-part test).

Here, the trial court concluded that ECA was not prejudiced by Wiggs' failure to timely identify Pascale or to provide his CV. Although Pascale's report—actually an itemized list of contents—was unsigned, ECA was in possession of the list for nearly two years prior to trial, since September 10, 2019. **See** Plaintiff's Response to Defendant's Motion *In Limine*, 5/24/21, at Exhibit 1 (transmittal email for contents list prepared by Pascale). Thus, ECA "had the time and opportunity to investigate the contents of the report" and the ability "to seek out and present their own expert at trial to counter the report." Trial Court Opinion, 6/29/22, at 9. The trial court also noted that ECA had the opportunity to cross-examine Pascale at trial. In addition, Pascale was listed as a witness in Wiggs' pre-trial memorandum, filed on May 12, 2021, twenty days before the commencement of trial. The court found that

ECA "had the time and opportunity to depose [Pascale] about his qualifications between the time he was identified and the trial," but chose not to do so. **Id.**

In **Kemp v. Qualls**, 473 A.2d 1369 (Pa. Super. 1984), this Court rejected the appellant's request for a new trial based on the late disclosure of an expert witness. Although the appellant had served pre-trial interrogatories seeking the identities and qualifications of any expert witnesses, the appellee did not disclose its expert's identity until three days prior to the start of trial and thirteen days before the expert actually testified. This Court concluded that appellant had suffered no prejudice, as it had "thirteen days in which to investigate the reputation and purported expertise of the witness prior to his testimony." **Id.** at 1374.

In **Curran v. Stradley, Ronon, Stevens & Young**, 521 A.2d 451 (Pa. Super. 1987), the appellant alleged that the trial court erred by precluding the testimony of its expert witness. There, appellant had arranged for an expert witness, who became unavailable shortly before trial. Ten days prior to trial, the appellant secured a substitute witness and the next day, advised appellee's counsel of the new witness. Eight days before trial, appellant provided appellee with an unsigned copy of the expert's report. In applying the four-part test set forth in **Gill**, the Court concluded that the prejudice to the appellant resulting from the inability to present expert testimony substantially outweighed the potential prejudice to appellee and remanded for a new trial.

Here, we conclude that the trial court did not err in allowing Pascale to testify. At the start of trial, ECA had been in possession of Pascale's contents list report for almost two years. Thus, it was aware of the substance of Pascale's testimony. **Feingold**, **supra**. Moreover, ECA was made aware of Pascale's identity twenty days before trial; as the trial court correctly noted, this provided ECA ample opportunity to depose Pascale prior to the commencement of trial, had it chosen to do so. **See Kemp**, **supra** (disclosure of expert's identity three days prior to start of trial and thirteen days before expert actually testified sufficient); **Curran**, **supra** (ten days' notice of expert's identity sufficient). Moreover, ECA had the opportunity to cross-examine Pascale regarding his qualifications. Finally, there is no record evidence to support ECA's bald assertion that Wiggs' conduct was willful or in bad faith. ECA received a fair trial and was not prejudiced by the court's admission of Pascale's testimony. **Kearns**, **supra**.

ECA next asserts that the trial court should have stricken Pascale's testimony, as Pascale "admitted to providing false testimony and destroying evidence." Brief of Appellant, at 15. Specifically, ECA cites testimony from Pascale that Wiggs had given him a handwritten list of contents that was never produced in discovery and that he admitted to having thrown out. Additionally, Wiggs stated that he had given Pascale two or three receipts attesting to the cost of certain items, which Pascale did not have. Finally, ECA alleges that Pascale admitted that he had fabricated approximately half of the items on the list of damaged or lost property. ECA is entitled to no relief.

ECA's assertion that Pascale admitted to fabricating his testimony is a gross mischaracterization of the record. At trial, Pascale testified that, in creating the list of contents, he used an industry-standard software that assists content estimators in situations where, like here, a large portion of a household's contents has been destroyed and/or disposed of. He testified that this was necessary because "there's a lot of items that [homeowners] do forget that they have in the house." N.T. Trial, 6/1/21, at 188. Pascale explained his methodology as follows:

Q: [C]an you just walk us through generally how you might go about making a contents estimate?

A: Normally, if there is a loss and you're able to see the actual contents, I would do a walk[ ]through the home. If the things are out of sight, I get the information from the [homeowner].

Q: When you say "out of sight," are there situations in your industry where the items may not be physically available for inspection?

A: Yes. Either they have been burned up in a fire, or thrown away, or destroyed and they are no longer on the premises.

Q: Is it common in your industry as a result of things like fire or theft or the discard of things being destroyed that you would have to create an estimate without physically seeing the items?

A: Yes.

Q: And in that situation, what is the industry standard for you to write that estimate?

A: It's through a program and I have a template of certain things and what's in each room. So based on that, it's a recreation of each room and what would be in that room.

Q: And who do you speak to to [] do that recreation?

A: The [homeowner].

. . .

Q:  Did you say you use a specific software program to assist you?

A:  Yes.

Q:  What is it called?

A:  [ X]actimate[.]

. . .

Q:  Is this software system recognized in the industry of contents estimating as a reliable system for contents estimates?

A:  Yes, absolutely.  Insurance companies use it.

*Id.* at 153-55, 163.

Pascale testified that he spoke with Wiggs on multiple occasions and asked him to think of items that were damaged, destroyed, and/or disposed of after the flooding.  Those items were incorporated into Pascale's estimate, along with items generated by the software.  Pascale acknowledged that errors do occur, given that the very nature of his job is to estimate and recreate what typically would be found in a home.

Q:  Was your estimate consistent with what you expected Mr. Wiggs to have in the home, given his living situation?

A:  Yes.

Q:  Is creating an estimate an exact science when you have to recreate it from nothing?

A: No.

Q:  [] Why did you use things like ranges to ultimately lock into a number with doing your estimate?

A:  Because they're not sure of the exact number, but they know it's between a certain range.

Q: Did you use that for input so that you can come up with something for the insurance?

A: Yes.

*Id.* at 188-89.

ECA's reliance on **Factor v. Bicycle Tech**, 707 A.2d 504 (Pa. 1998), is misplaced. There, the Supreme Court awarded the plaintiff a new trial where defense counsel knowingly and intentionally presented misleading testimony, which should have been stricken. However, **Factor** is clearly distinguishable from the case *sub judice*. Here, rather than intentionally misleading the court, Pascale was fully transparent with regard to his methodology and stated that a significant portion of the contents listed were, in fact, the result of estimates produced by industry-standard software. Moreover, defense counsel vigorously cross-examined Pascale on his methods and on the contents of the list itself.

Similarly, ECA's claim of spoliation fails. When reviewing a court's decision to grant or deny a spoliation sanction, we must determine whether the court abused its discretion. **Croydon Plastics Co. v. Lower Bucks Cooling & Heating**, 698 A.2d 625, 629 (Pa. Super. 1997). "An abuse of discretion is not merely an error in judgment; rather it occurs when the law is overridden or misapplied, or when the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias or ill-will." **Pilon v. Bally Eng'g Structures**, 645 A.2d 282, 285 (Pa. Super. 1994).

To determine the appropriate sanction for spoliation, the trial court must weigh three factors:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

***Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division***, 781 A.2d 1263, 1269–70 (Pa. Super. 2001). Evaluation of the "fault" prong requires consideration of two components: (1) the extent of the offending party's duty or responsibility to preserve the relevant evidence, and (2) the presence or absence of bad faith. ***See id.*** at 1270. The "duty" prong, in turn, is established where: "(1) the plaintiff knows that litigation against the defendants is pending or likely; and (2) it is foreseeable that discarding the evidence would be prejudicial to the defendants." ***Id.*** at 1270–71.

Here, Pascale testified that he had disposed of a handwritten list of contents[2] provided to him by Wiggs, but that all the items from the handwritten list were incorporated into the contents list he submitted to counsel. ***See*** N.T. Trial, 6/1/21, at 174-75. Defense counsel had the opportunity to thoroughly cross-examine Pascale regarding his handling of the handwritten list and the manner and extent to which he supplemented Wiggs' list utilizing his estimation software. Moreover, ECA had been in possession of Pascale's contents list since September 2019, but chose not to investigate

---

[2] With regard to the receipts Wiggs allegedly gave Pascale, Pascale testified that he did not remember if Wiggs gave him any receipts, but in any case, he did not have them any longer. ***See*** N.T. Trial, 6/1/21, at 179-80.

or otherwise inquire as to its content or origins. Accordingly, we can discern no prejudice to ECA as a result of Pascale's failure to retain the original list.

Moreover, there is no evidence that Wiggs or his counsel acted in bad faith, or intentionally concealed Wiggs' handwritten list of contents. Rather, Pascale simply believed the original document to be superfluous. *See id.* at 175 ("Q: You threw it away? A: Why would I need it, when I have the actual estimate that I wrote?").

Finally, at the request of ECA's counsel, the trial court gave the jury a spoliation instruction as follows:

> [THE COURT:] There is a charge I would like to give to you and it's called spoliation, and that charge is as follows: If a party disposes of or alters a piece of evidence before the other party had an opportunity to inspect it, and if the party who disposes of or altered the evidence should have recognized the evidence was relevant to an issue in this lawsuit, you may find that this evidence would have been unfavorable to them unless they satisfactorily explain why they disposed of or altered the evidence.[3]

N.T. Trial, 6/3/21, at 94-95. ECA's counsel also recited the spoliation instruction during his closing argument. *See id.* at 59. "It is well settled that the jury is presumed to follow the trial court's instructions." *Commonwealth v. Vucich*, 194 A.3d 1103, 1113 (Pa. Super. 2018).

For the foregoing reasons, the trial court did not abuse its discretion in denying ECA's motion to strike the testimony of Wiggs' contents expert.

---

[3] Although the trial court found the need for such an instruction "debatable, given Pascale's explanation," the court issued the instruction "in an effort to treat [ECA] fairly." Trial Court Opinion, 6/29/22, at 14.

- 15 -

ECA next claims that the trial court erred in denying its motion for a new trial or in not molding the verdict with respect to damages, where the jury's award for structural damages was against the weight of the evidence. ECA argues that the verdict bears "no relation" to the structural damages proven by Wiggs. Brief of Appellant, at 19. ECA asserts that the "highest amount of damages that could [have been] awarded for structural damages was $116,048.25[,] . . . the amount of damages testified to by [Wiggs'] structural expert, Timothy Brennan." *Id.* at 19-20. ECA claims that the only explanation for the jury's verdict is that it was "based on passion, prejudice and/or partiality—that which is specifically prohibited by law—or just a misunderstanding of the law." *Id.* at 20. ECA is entitled to no relief.

> [A]ppellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Corvin v. Tihansky*, 184 A.3d 986, 992 (Pa. Super. 2018), quoting *Phillips v. Lock*, 86 A.3d 906, 919 (Pa. Super. 2014) (internal quotation marks and citation omitted).

In addition,

[t]he grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court. This [C]ourt will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive.

*Corvin*, 184 A.3d at 992, quoting ***Whitaker v. Frankford Hosp. of City of Philadelphia***, 984 A.2d 512, 523 (Pa. Super. 2009) (citations omitted).

The general rule in this Commonwealth is that the plaintiff bears the burden of proof as to damages.

The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses.

Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

***Omicron Sys., Inc. v. Weiner***, 860 A.2d 554, 564–65 (Pa. Super. 2004), quoting ***Judge Technical Services, Inc. v. Clancy***, 813 A.2d 879, 885 (Pa. Super. 2002) (citation omitted).

Here, the trial court addressed ECA's weight and excessiveness claims as follows:

In the present case, the jury awarded [Wiggs] $150,000 for the structural damage sustained to his home as a result of the Defendant's negligence in opening the roof before a massive rainstorm and failing to make timely repairs. The Plaintiff initially sought $116,048.25, the total amount itemized in Brennan's

report. Hence, the jury's award exceeded the Plaintiff's demand by $33,951.75. However, $116,048.25 was not the entire amount [Wiggs] sought to recover. In total, [Wiggs] sought $290,246.50. Even though this single portion of the award was higher than initially sought, the total jury award of $225,000 was still well below the total amount [Wiggs] was seeking.

During trial, [which occurred in 2021,] Brennan testified that the Xactimate program used the prices in the Philadelphia area in July 2019 to calculate the total price of the project. Brennan also testified about miscellaneous costs on Page 20 of his report.

Hence, when we consider Brennan's testimony, the jury's award was not "plainly excessive," as it was only slightly more than 125% of the amount [Wiggs] sought for structural damages. This difference is reasonable to account for any jury doubt about the Xactimate program using an average cost of material and labor for the area instead of exact costs.

. . .

In this case, the jury's verdict fell within the acceptable measure of speculation. Brennan testified that interior items that are saturated with water must be replaced, or they become moldy. He further testified that restoration of [Wiggs'] home would take months to complete. While it appears as though the jurors accepted Brennan's base estimate, no one knows exactly what other factors the jury considered in rendering its overall verdict. However, given Mr. Brennan's testimony, it [] would not have been unreasonable for the jury to believe [Wiggs'] full restoration costs may have been higher than his estimated costs because of the extensiveness of the job and future work that would likely be needed to address any structural problems in the property related to the water damage [Wiggs] sustained. Given the extensive water damage that [Wiggs] sustained, the jury's verdict was not unreasonable.

Trial Court Opinion, 6/29/22, at 20-21 (footnotes omitted).

We can discern no abuse of discretion in the trial court's conclusion that a new trial is not warranted based on ECA's excessive damages claim. The jury was able to view video and photographic evidence demonstrating the

- 18 -

extensive damage caused by ECA's admitted negligence. As Wiggs aptly argues, the jury could have reasonably inferred that a higher award was justified "due to the inflation in construction costs that occurred between the computation of the estimate in 2019 and the [] trial two years later in 2021." Brief of Appellee, at 22. **See also Omicron Sys., Inc.**, **supra** (jury may use "measure of speculation" and may act on inferential proof in estimating damages).

Moreover, ECA's reliance on **Herring v. City of Jeannette**, 47 A.3d 202 (Pa. Cmwlth. 2012), is misplaced. ECA baldly argues that **Herring** applies here because it stands for the proposition that a plaintiff is only entitled to "the maximum damages that she could recover, even if all factual disputes were resolved in her favor[.]" Brief of Appellant, at 20, citing **Herring**, 47 A.3d at 205. **Herring**, however, is inapt, as the actual issue in that case was whether a homeowner whose property was damaged could recover the full cost of repairs ($31,500) where the property in its undamaged state was only valued at $24,000. Here, ECA makes no argument that the damages awarded exceeded the market value of Wiggs' home.

In short, the verdict does not shock our sense of justice. **Corvin**, **supra**. Accordingly, ECA is entitled to no relief on its weight claim.

Finally, ECA argues that "[t]wo pieces of evidence were improperly admitted at trial which unfairly prejudiced [ECA] and warrant" reversal and the grant of a new trial. Brief of Appellant, at 20. Specifically, ECA claims that Wiggs' testimony that he had not received any payment for his damages

at the time of trial "was irrelevant and was introduced only to may [ECA] look bad." *Id.* at 21. ECA also takes issue with Wiggs' testimony that there was mold in his home as a result of the water incursion and that he had increased coughing as a result. ECA notes that, pursuant to the trial court's ruling on its pretrial motion *in limine*, Wiggs was barred from testifying "about the causal connection between his health symptomatology and the . . . negligence that occurred." N.T. Trial, 6/1/21, at 14. ECA asserts that the evidence was irrelevant and introduced only to garner sympathy for Wiggs. *See* Brief of Appellant, at 21.

Wiggs responds that testimony relating to his perception of the property, including the presence of mold, and about the fact that he had not received any compensation to date was relevant to his claims. Wiggs asserts that his observations as to the presence of mold on the property went "directly to the extent of water damage that [Wiggs'] home suffered[,] which was the issue before the jury." Brief of Appellee, at 25. Wiggs also notes—correctly—that he did not testify about coughing, and ECA supplied no citation to the record to demonstrate otherwise. *See id.* at 24. In addition, Wiggs argues that testimony regarding whether he had received any compensation was relevant to whether his damages should be reduced and was introduced "to ensure that [Wiggs] would receive full compensation for his loss." *Id.*

Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence and the fact is of consequence in determining action. *See* Pa.R.E.

401. Generally, all relevant evidence is admissible. However, relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. *See* Pa.R.E. 403. For this purpose, "[p]rejudice does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis." ***Pittsburgh Const. Co. v. Griffith***, 834 A.2d 572, 585 (Pa. Super. 2003) (citation and quotation marks omitted).

Here, we agree with Wiggs that his brief testimony regarding the presence of mold, ***see*** N.T. Trial, 6/1/21, at 68-69, 93, and his lack of compensation, ***see id.*** at 95, was relevant to the jury's assessment of his damages. ***See*** Pa.R.E. 401. No scientific expertise is required to recognize such a commonly occurring substance as mold and, as the trial court noted, "this testimony helped the jury to better understand the extent to which [Wiggs'] home was damaged and to understand why [he] discarded the contents of his home." Trial Court Opinion, 6/29/22, at 22-23. Similarly, Wiggs' counsel's single question regarding prior compensation was relevant to establishing that Wiggs was entitled to the full extent of his claimed damages and Wiggs' testimony in response was not unduly prejudicial to ECA. Accordingly, ECA is entitled to no relief.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/29/2023