Roger SCHRADER, Special Administrator of the Estate of Eileen Schrader, Plaintiff and Appellant,

v.

Dr. Brian TJARKS and St. Joseph Hospital of Mitchell, South Dakota, Defendants and Appellees.

Nos. 18325, 18519.

Supreme Court of South Dakota.

Argued March 22, 1994.

Decided Sept. 28, 1994.

Rick Johnson of Johnson, Eklund, Nicholson, Dougherty & Abourezk, Gregory, for plaintiff and appellant.

Edwin E. Evans and Timothy M. Gebhart of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for appellee Dr. Brian Tjarks.

James E. McMahon of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for appellee St. Joseph Hosp.

JOHNSON, Circuit Judge.

Roger Schrader (Schrader), Special Administrator of the Estate of Eileen Schrader (Eileen) appeals from a judgment entered on a unanimous jury verdict in favor of Dr. Brian Tjarks (Tjarks) and St. Joseph Hospital (Hospital) in a medical malpractice action.

Schrader claims error resulting from a protective order granted by the trial court which precluded the rebuttal testimony of Thomas L. Bennett, M.D., Diana Weiland, R.N., and Dan Carlson, an E.M.T. instructor and the trial court's denial of Schrader's motion for a continuance. Schrader also appeals the trial court's refusal to have plaintiff's lay witness read to the jury a published treatise on viral myocarditis as being contrary to SDCL 19–16–22. Notice of appeal was filed April 8, 1993.

Schrader subsequently appealed that part of an April 30, 1993 order and notice of an order on the taxation of costs in which the trial court taxed expert witness fees and attorney travel expenses against Schrader in the total amount of $8,660.60. Notice of appeal was filed on October 6, 1993. The two appeals were consolidated by order of this Court dated October 27, 1993. We affirm in part, reverse in part, and remand for new trial.

### FACTS

Roger and Eileen owned and operated the Bonanza Restaurant and Steakhouse in Mitchell, South Dakota. Eileen died on February 27, 1991 of acute myocarditis. Schrader brought a wrongful death action as a Special Administrator of the Estate of Eileen Schrader against the attending emergency room physician, Tjarks and Hospital. The action was brought on behalf of Schrader as well as for the benefit of their three children, Jennifer, Amber, and April who were ages 9, 7, and 5 at the time of their mother's death.

During the week of February 18, 1991, Eileen had stayed home to take care of their daughters who were suffering from bad colds and the flu. By Friday, February 22, Eileen developed a cough and by Sunday she had contracted diarrhea along with the cough. She called Dr. Gaede (a partner of Dr. Tjarks) and received a prescription for Cephalexin and Robitussin DAC syrup with codeine. Despite the medication, Eileen continued to worsen over the next two days. At approximately 9:00 a.m., on the morning of February 27, Schrader took his wife to the Hospital's emergency room. Sue Denke, a registered nurse, first examined Eileen.

Nurse Denke then contacted Tjarks, who ordered a complete blood count, a chest X-ray, and an arterial blood gas test. Those tests came back inconclusive. He diagnosed her as having a probable upper respiratory infection and gave Eileen a shot of Mepergan and Eileen was then discharged by Mildred Wagner, R.N. She was told to rest and drink plenty of fluids and to return if she had any problems.

Eileen's condition worsened throughout the day. Her mother-in-law called the clinic late that afternoon and told Tjarks that Eileen had gray and blue lips, chalky colored skin and extreme back and chest pain. Tjarks advised that if she was uncomfortable with the way Eileen looked to bring her back in. At approximately 5:15 p.m., Schrader returned with his wife. While Schrader carried Eileen back into the emergency room, Eileen's right leg went stiff, her eyes rolled to the back of her head and she was rushed off for "Code Blue." Despite resuscitative efforts, Eileen died at approximately 7:00 p.m. at the age of 29.

Dr. Kim Lorenzen, a pathologist for Physicians Laboratory performed the autopsy. He determined the cause of Eileen's death as acute myocarditis, an inflammation of the cells within the heart muscle which causes injury or death to the heart tissue. Dr. Lorenzen concluded that the upper respiratory infection had spread throughout her heart.

Schrader commenced this action on December 16, 1991. He identified Dr. Michael Jobin, M.D. (Board Certified Emergency Room Physician) as his expert in his answer to Hospital's first set of interrogatories on January 28, 1992. On August 25, 1992, defendants deposed Dr. Jobin. On September 14, 1992, Schrader served interrogatories on defendants. On September 29, 1992, Hospital indicated that they have no experts in Hospital's answers to Schrader's set of interrogatories.

Tjarks listed one expert, Dr. Galen Vonk, M.D. (a cardiologist) on October 26, 1992. Hospital next supplemented their response to interrogatories on November 16, 1993, two months after the original request by Schrader, listing Jane Mutschelknaus (a registered

nurse) as an expert for the standard of care in nursing.

Tjarks next supplemented his answers to Schrader's interrogatories on January 5, 1993 listing Dr. Seymour Handler (a pathologist) almost four months after the original request. On February 1, 1993, Schrader deposed Dr. Handler in Minneapolis. Then, Tjarks supplemented his answers, almost five months after the original request for experts, on February 2, 1993, listing Dr. Tom Huber (a family physician).

Schrader deposed both Dr. Vonk and Nurse Mutschelknaus three weeks before trial on February 8, 1993. On February 19, 1993, Schrader filed supplemental answers to interrogatories listing Dr. Tom Bennett (a pathologist) as a rebuttal witness to Dr. Handler (eighteen days after his deposition) and Dr. Vonk (eleven days after his deposition); Diana Weiland, R.N. as a rebuttal witness to Jane Mutschelknaus, R.N. (eleven days after her deposition); and Dan Carlson, an E.M.T. instructor.

Schrader moved to strike Dr. Huber, claiming lack of timely disclosure. A hearing was held on February 16, 1993 in which Judge McMurchie denied the motion. However, three days after such ruling, Schrader disclosed three rebuttal witnesses. At a February 24, 1993 hearing, Judge McMurchie granted Hospital's and Tjarks' motion for a protection order excluding Schrader's three rebuttal witnesses and denied permission for them to sit in at the trial. At the hearing, Schrader requested a continuance. The court denied the motion due to the court's "impacted schedule." Judge McMurchie stated that the issue before the court was not whether the experts were offered for rebuttal or for the case in chief, but whether Schrader gave seasonable notice as required by the Rules of Civil Procedure. He stated:

> The issue here solely is if you have sufficient time, and that is, based upon the various cases, giving each counsel the opportunity to review the credentials and prior history of the individual to be called as an expert for purposes of impeachment … it's the ruling of this Court that the experts were not disclosed within a time frame accessible under the rules and common-sense for purposes of discovery as far as credentials. . . .

A trial was held in this matter from March 1–8, 1993. Schrader's case-in-chief set forth the theories that both the Hospital and the attending physician, Tjarks, violated the standard of care required in the medical community and that there was a likelihood of recovery if Eileen had been hospitalized right away and treated. Schrader relied on Dr. Jobin for expert testimony against both Tjarks and Hospital. Hospital and Tjarks offered a three point defense: (1) Eileen's myocarditis was irreversible and no treatment would have saved her (Vonk); (2) that even if Hospital and Tjarks had diagnosed the myocarditis, the condition was unsurvivable (Vonk and Handler) (mortality rate); and (3) given the symptoms of Eileen at the time, it was not possible to diagnose the myocarditis (Vonk and Handler). At the close of the evidence, Schrader renewed his motion to call rebuttal witnesses. Schrader submitted affidavits from Dr. Tom Bennett, Diana Weiland and from Schrader's counsel submitting a chronological outline of the discovery proceedings. The trial court denied the motion.

## ISSUES

I. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO ALLOW SCHRADER TO CALL REBUTTAL WITNESSES AND THEN REFUSING SCHRADER'S REQUEST FOR A CONTINUANCE.

II. WHETHER THE TRIAL COURT ERRED IN REFUSING SCHRADER'S PROOF OF THE CONTENTS OF A MEDICAL RESEARCH ARTICLE PURSUANT TO SDCL 19–16–22.

III. WHETHER COSTS WERE IMPROPERLY TAXED BY THE TRIAL COURT.

## I.

The trial court erred in denying Schrader's rebuttal witnesses based on whether they were seasonably disclosed pursuant to SDCL 15–6–26(e)(1)(B). SDCL 15–6–26(e)(1)(B) provides in pertinent part:

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

> (1) A party is under a duty *seasonably* to supplement his response with respect to any question directly addressed to ... (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

SDCL 15–6–26(e)(1)(B) (emphasis added). Throughout the course of discovery, South Dakota law allows the other side to discover experts that will be used in trial preparation. SDCL 15–6–26(b). Specifically, the rule allows:

> A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

SDCL 15–6–26(b)(4)(A)(i).

Likewise, South Dakota law allows the plaintiff to call rebuttal witnesses. According to SDCL 15–14–1(5), "[t]he party having the burden of proof may then offer rebutting evidence only, and the opposing party may also offer rebutting evidence only, unless the court for good reason, in furtherance of justice, permit them to offer evidence upon their original case[.]" SDCL 15–14–1.

"Rebuttal evidence is that which explains, contradicts, or refutes the defendant's evidence. Its purpose is to cut down defendant's case and not merely to confirm that of the plaintiffs." *Farmers U. Grain Term. v. Industrial Elec.*, 365 N.W.2d 275, 277 (Minn. App.1985) (citation omitted). "Rebuttal is appropriate only when the defense injects a new matter or new facts." *Pophal v. Siverhus*, 168 Wis.2d 533, 484 N.W.2d 555, 563 (App.1992) (citation omitted).

Neither statute or rules, nor South Dakota precedent require disclosure of rebuttal witnesses, however, other jurisdictions have required seasonable disclosure of rebuttal experts. In *Massman v. City of Helena*, 237 Mont. 234, 773 P.2d 1206, 1211 (1989), the Supreme Court of Montana found that there is no law within the Rules of Civil Procedure that requires advance disclosure of rebuttal witnesses. *Id.* In *McDonald's Corp. v. Butler Co.*, 158 Ill.App.3d 902, 110 Ill.Dec. 735, 742, 511 N.E.2d 912, 919 (1987), the Illinois Appellate Court found that rules with respect to disclosure of expert witnesses applies to rebuttal witnesses as well. *Id.; Clark v. Hoerner*, 362 Pa.Super. 588, 525 A.2d 377, 383 (1987) (finding discovery rules apply to rebuttal experts); *Cf. Coca–Cola Bottling Co. v. Stripling*, 622 So.2d 882, 887–89 (Ala.1993) (finding the scheduling order and Rule 26(b)(4)(A) required the disclosure of rebuttal experts); *Jewelcor Jewelers & Distrib. v. Corr*, 373 Pa.Super. 536, 542 A.2d 72, 78–79 (1988) (excluding rebuttal experts because not seasonably disclosed).

We recognized in *Stormo v. Strong*, 469 N.W.2d 816, 820 (S.D.1991), that "[t]rial courts have broad discretion concerning the admission of expert testimony." *Id.* (citing *Zepp v. Hofmann*, 444 N.W.2d 28, 31 (S.D. 1989)). "The trial court's evidentiary rulings are presumed correct and will not be reversed unless there is a clear abuse of discretion." *Id.* (quoting *Zepp, supra*); *See Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D. 1986) (citation omitted). We have held that an abuse of discretion "refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Sander v. Geib, Elston, Frost Pro. Ass'n*, 506 N.W.2d 107, 113 (S.D.1993) (citations omitted). SDCL 15–6–37 gives the trial judge broad latitude in penalizing the party who has failed to comply with discovery orders, however such latitude is not limitless. *Chittenden & Eastman Co. v. Smith*, 286 N.W.2d 314, 316 (S.D.1979) (citation omitted). Not only must this Court find that the trial court abused its discretion in excluding the three rebuttal witnesses, but it must find that the jury's consideration of the erroneously excluded evidence might and probably would have resulted in a different finding by the

jury in order to warrant a reversal of the trial court. *Sander, supra* (citations omitted); *Shaffer v. Honeywell, Inc.,* 249 N.W.2d 251, 258 (S.D.1976); *Alberts v. Mutual Serv. Casualty Ins. Co.,* 80 S.D. 303, 123 N.W.2d 96 (1963).

■ Trial courts are authorized under SDCL 15–6–37(b)(2)(B) to prohibit the disobedient party, who fails to comply with the discovery rules, from introducing designated matters into evidence. While trial courts have broad discretion to determine appropriate sanctions for not seasonably disclosing expert witnesses, this Court noted in *Magbuhat,* that SDCL 15–6–37(b) is:

> designed to compel *production* of evidence and to promote, rather than stifle, the truth finding process. *See Chittenden, supra.* The severity of the sanction must be tempered with consideration of the equities. *Id.* at 316–17. Less drastic alternatives should be employed before sanctions are imposed which hinder a party's day in court and thus defeat the very objective of the litigation, namely to seek the truth from those who have knowledge of the facts. *Id.* at 316.

*Magbuhat,* 382 N.W.2d at 45. Imposing a sanction such as the exclusion of the testimony should result when "failure to comply has been due to ... willfulness, bad faith, or any fault of petitioner." *Chittenden,* 286 N.W.2d at 316 (citations omitted). We went on to say that drastic sanctions under Rule 37 are not authorized when "the failure to comply is the result of inability rather than willfulness or bad faith." *Id.* (citation omitted).

Here, it is true that the trial judge did not have a scheduling order listing a date for when discovery was to cease. Mention was made in the record that discovery should be completed by the pretrial conference which was held on February 16, 1993. However, this Court finds that was mentioned more as a goal rather than as binding on the parties.

Schrader's failure to identify the rebuttal witnesses was due to the fact that Hospital and Tjarks did not begin to supplement their answers to interrogatories listing their experts witnesses until mid-October of 1992 and finally ending one month before trial on February 2, 1993. Due to scheduling con-

flicts, Schrader did not depose these witnesses until February of 1993. Schrader states that upon receiving the transcripts of the depositions, it was only a matter of days before disclosing the rebuttal witnesses that he planned to use. In fact, Schrader had first contacted Dr. Bennett on February 15, 1993 and filed supplementation to his interrogatories on February 22, 1993 listing him as a rebuttal witness.

■ Schrader was not motivated by procrastination, bad planning, dilatory tactics or bad faith. Upon deposing Hospital's and Tjarks' experts, Schrader immediately disclosed three rebuttal witnesses. It is "[t]he general rule in medical malpractice cases ... that negligence must be established by the testimony of medical experts." *Magbuhat,* 382 N.W.2d at 46 (citing *Block v. McVay,* 80 S.D. 469, 474, 126 N.W.2d 808, 810 (1964)). In a medical malpractice case, plaintiff has the burden to show whether the "doctor deviated from the required standard of care." *Id.* By excluding Schrader's rebuttal witnesses, the trial judge, in effect, eliminated Schrader's counter attack to the defense experts. This action by the trial judge was against reason and evidence. Since the exclusion of the testimony should be a last resort effort as a sanction available to the trial court when a party does not seasonably disclose expert witnesses, and since the record does not reflect that Schrader acted in bad faith in disclosing experts and did, in fact, timely disclose, we hold the trial court abused its discretion in excluding the three rebuttal expert witnesses.

■ Not only must we find that the trial court abused it's discretion but we must determine whether the testimony of Dr. Tom Bennett, a pathologist, Diana Weiland, R.N. and Dan Carlson, an E.M.T instructor, might and probably would have resulted in a different finding by the jury in order to warrant a reversal of the trial court. Dr. Bennett is a pathologist who was offered to refute Dr. Lorenzen's (in-house pathologist), Dr. Seymour Handler's (pathologist) and Dr. Galen Vonk's (cardiologist) testimony. In his February 26, 1993 affidavit, Dr. Bennett stated that he would testify to the following: (1)

that it is medically impossible to determine whether the myocarditis that Eileen suffered from would have caused a "sudden death" or would have prevented survival if she had been treated in an intensive care or coronary care unit instead of being discharged; (2) according to medical journals, there is an in excess of a 70% survival rate for those suffering from acute myocarditis; and (3) nothing to the contrary indicates that Eileen would not have had the same rate of survival as listed in the medical journals; and, in her absence of heart disease, young age and prior good health, she may have had a higher rate than the 70% average.

Dr. Lorenzen and defense experts, Dr. Galen Vonk and Dr. Seymour Handler all based their testimony on the examination of tissue slides of Eileen's heart and the autopsy report. Thus, Dr. Bennett was offered to rebut their opinions by also examining the tissue slides and the autopsy report. Dr. Lorenzen who performed the autopsy originally testified in his deposition that Eileen had mild inflammation of her heart. He opined that he was unable to determine whether the damage to Eileen's heart was reversible or not. However, at trial he deviated from his deposition testimony that it was mild inflammation to stating that this was the "most extensive damage" from myocarditis that he had ever seen. Dr. Seymour Handler, a pathologist, testified that "nobody with this amount of disease in the heart can survive no matter what is done." He stated, "this is an absolutely fatal condition and there is no therapy that will make any difference anyway." Dr. Galen Vonk, a cardiologist, opined that the Eileen's condition was not clinically diagnosable and that she died a "sudden death" and absolutely no treatment would have saved her. Dr. Bennett's testimony would have directly rebutted these defense experts. We find that it is possible, had Dr. Bennett been allowed to testify, that the jury could have concluded a different result in this case.

Diana Weiland, R.N. was offered to rebut Jane Mutschelknaus' claim that it is within the nursing profession's standard of care to release a patient in Eileen's condition without rechecking her vital signs. In her March 5, 1993 affidavit, Nurse Weiland stated that after a patient receives a Mepergan injection, the "patient's vital signs should be retaken and re-evaluated so that the effects of the injection can be properly evaluated before allowing discharge and to enable the nurse to notify the doctor ordering the injection of any worsening of the patient's condition that may have followed the injection." Nurse Mutschelknaus testified that she did not see any need to repeat vital signs in a situation like this. She testified that Nurses Sue Denke's and Millie Wagner's actions were within the nursing standard of care. During the trial, defendants argued that plaintiff's case-in-chief expert, Dr. Jobin (a Board Certified Emergency Physician) testified that the nursing care was substandard and that Diana Weiland's testimony was merely cumulative. However, it is noted that the defense also argued that since Dr. Jobin is an out-of-state doctor, that the standard of care is different in South Dakota than his home state of Colorado. Therefore, Schrader would have offered on rebuttal a nurse from South Dakota who would testify that the South Dakota nursing standards of care were violated. However, the trial court excluded such testimony and we find that such refusal could lead the jury to come to a different conclusion.

Dan Carlson, an E.M.T. instructor, was not listed in Schrader's supplementation of his interrogatories as specifically rebutting a particular expert. Lack of available record makes it difficult for this Court to ascertain whether Mr. Carlson's testimony would have made the jury come to a different result. We cannot say that the trial judge improperly excluded Mr. Carlson as a rebuttal witness.

We hold the trial court abused its discretion in excluding Schrader's expert rebuttal witnesses. We also hold that the trial court committed prejudicial error as a result of such exclusion. The trial court should have allowed rebuttal testimony, and should have allowed the defense the option of a continuance.

 Hospital and Tjarks devote a large amount of time arguing whether the rebuttal witnesses were in fact expert witnesses for

Schrader's case in chief. The trial judge at the February 24, 1993 hearing specifically addressed that that was not an issue to be decided. He limited his exclusion based on the reasonableness of Schrader's disclosure. We held in *Weaver v. Boortz*, 301 N.W.2d 673 (S.D.1981), that issues which were not brought up at the trial court level are not properly brought before us on appeal. Therefore, this Court will not address whether Schrader's three expert witnesses were in fact rebuttal or case in chief witnesses.

## II.

The trial court did not err in refusing Schrader's proof of the contents of a medical research article pursuant to SDCL 19–16–22. The article at issue was entitled "The Long–Term Prognosis in Acute Myocarditis," 8 European Heart Journal 251–253. Schrader's case-in-chief expert, Dr. Jobin relied on it in forming an opinion as to Eileen's survival rate of acute myocarditis. Later, Tjarks' expert, Dr. Handler testified that he did not believe the survival statistics as quoted by Dr. Jobin. By the time Dr. Handler had testified, Dr. Jobin had left the trial and had gone back to Denver. So Schrader put Kelly Schrader, sister-in-law to Eileen, on the stand to read the treatise to the jury as rebuttal to Dr. Handler. Kelly Schrader testified that she had gone to Dakota Wesleyan University to find out whether the European Heart Journal was a reliable source. Hospital and Tjarks objected to the reading of the treatise. The trial court sustained defendants' objection to the reading of the treatise.

In *Zens v. Chicago, Milwaukee, St. Paul & Pac.*, 479 N.W.2d 155, 159 (S.D.1991), we stated in reviewing whether a trial court erred in admitting a learned treatise, the appellant must establish that it was not only error but prejudicial error. "Prejudicial error is 'that which in all probability must have produced some effect upon the final result and affected rights of the party assigning it. It is error 'without which the jury would have probably returned a different verdict'." *Id.* (citations omitted).

SDCL 19–16–22 is a hearsay exception which allows for the admission of learned treatises. It states:

**19–16–22. (Rule 803(18)). Learned papers relied on by expert admissible.** To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice are not excluded by § 19–16–4, even though the declarant is available as a witness. If admitted, the statements may be read into evidence but may not be received as exhibits.

SDCL 19–16–22 (1987). John Larson stated in *South Dakota Evidence* that the party seeking to introduce the learned treatise must lay the proper foundation. Larson, *South Dakota Evidence*, § 803.18 (1991). He stated, "[w]ith regard to laying a proper foundation, the proponent must establish the publication as a reliable authority, which can be done by the testimony or admission of the expert witness, or by the testimony of another expert that the expertise of the author is recognized in the field and the particular publication is regarded as accurate by other professions." *Id.*

■ Therefore, the treatise must be a (1) reliable authority, and (2) an expert must rely on it. While Dr. Jobin relied on it, it was improper for a non-expert, Kelly Schrader, to attempt to read it into evidence. The Federal Rules of Evidence Advisory Committee Notes explain that an expert should be on the stand to read it to the jury. The Committee stated:

The rule avoids the danger of misunderstanding and misapplication by limiting the use of treatises as substantive evidence to situations in which an *expert is on the stand and available to explain and assist in the application of the treatise desired.* The limitation upon receiving the publication itself physically in evidence, contained

in the last sentence, is designed to further this policy.

*Larson, supra.*

■ Schrader could have had one of the medical experts read the treatise to the jury but did not do so. The trial court properly refused a reading of the article by a lay person who would be unable to explain the treatise to the jury.

### III.

The trial court assessed disbursements in favor of defendants and against plaintiff in the amount of $8,660.60. Schrader appeals that part of the award which allows expert witness fees and attorney travel expenses.

■ Effective July 1, 1992, SDCL 15–17–37 replaced SDCL 15–17–4, allowing taxation of disbursements:

> The prevailing party in a civil action or special proceeding may recover expenditures necessarily incurred in gathering and procuring evidence or bringing the matter to trial. Such expenditures include costs of telephonic hearings, costs of telephoto or fax charges, fees of witnesses, interpreters, translators, officers, printers, service of process, filing, expenses from telephone calls, copying, costs of original and copies of transcripts and reporter's attendance fees, court appointed experts and other similar expenses and charges. These expenditures are termed "disbursements" and are taxed pursuant to § 15–6–54(d).

SDCL 15–17–37 (1994).*

The trial court did not have the benefit of our decision in *Nelson v. Nelson Cattle Co.,* 513 N.W.2d 900 (S.D.1994), which we rendered while this appeal was pending. We concluded that the new statute did not contemplate the payment of fees to experts not appointed by the court, above and beyond the statutory witness fee authorized by SDCL 19–5–1. The expert witnesses involved here were not appointed by the court. *Id.* at 907. We further held SDCL 15–17–37

inapplicable to cases commenced prior to July 1, 1992, and determined subsequent to that date. This action was commenced in December 1991, and judgment was entered on March 15, 1993.

■ The trial court also allowed travel expenses of defense counsel in connection with taking of depositions, including those taken in Denver and Minneapolis. They argue that these are "other similar expenses and charges" incurred in gathering and procuring evidence and bringing the matter to trial, within the meaning of SDCL 15–17–37. We disagree. Had the legislature intended to include these expenses they would have said so, as they did with costs of transcripts and court reporter attendance fees.

We hold that attorney travel expenses in connection with the taking of depositions are not "other similar expenses and charges" within the meaning of SDCL 15–17–37.

Alternatively, defendants' argue that expert witness fees may be assessed pursuant to SDCL 15–17–44, which provides:

> If there is no specific statutory authorization allowed for taxation of disbursements in a civil action or special proceeding, taxation of disbursements may be allowed in the discretion of the court.

■ This statute was enacted effective July 1, 1992, as a companion to SDCL 15–17–37, and which was subsequent to the commencement of this action. In *Nelson, supra,* we concluded that retroactive application of 15–17–37 would create a new and substantially greater liability for witness fees and therefore should be prospective only. We take the same position with respect to SDCL 15–17–44, giving it prospective application only. *Id.* at 908.

We conclude that the trial court abused its discretion by allowance of expert witness fees and attorney travel expenses, and remand for further proceedings consistent with this opinion.

---

* The previous version of SDCL 15–17–37 was 15–17–4 and it reads:

> In all cases where a party is allowed to recover costs the clerk must also tax as a part of the judgment the allowance of such party's witnesses', interpreters', translators', officers', and printers' fees, fees for the service of process, filing fees and the necessary expense of taking depositions and procuring necessary evidence.

We need not address Schrader's additional claim that the award of expert witness fees and attorney travel expenses violates the "Open Courts" provision of the South Dakota Constitution, art. VI, § 20.

We affirm in part, reverse in part and remand for new trial.

MILLER, C.J., and HENDERSON, Retired Justice, and DOBBERPUHL, Circuit Judge, concur.

AMUNDSON, J., concurs in part and dissents in part.

JOHNSON, Circuit Judge, for WUEST, J., disqualified.

DOBBERPUHL, Circuit Judge, for SABERS, J., disqualified.

KONENKAMP, J., not having been a member of the Court at the time this action was submitted, did not participate.

AMUNDSON, Justice (concurring in part and dissenting in part).

The jury in this case returned a general verdict for the defendants. When reviewing a general verdict for the defendants in a medical malpractice action, this court held in *Fjerstad v. Sioux Valley Hospital*, 291 N.W.2d 786 (S.D.1980), as follows:

> A verdict should be sustained and should not be set aside unless it is irreconcilably inconsistent or is so vague that its meaning is uncertain. The verdict of the jury may be construed in light of the pleadings, the issues made by the evidence and the jury instructions.... It is presumed that a jury understands and abides by the court's instructions.... Even if the verdict is susceptible of two constructions, the construction that sustains the verdict must be applied.

*Id.* at 788 (citations omitted).

At the conclusion of this hotly contested case, the jury was appropriately instructed that in a malpractice case it must first find that the defendants breached a recognized standard of care and was thereby negligent. If the jury finds the defendants to have been negligent, the jury next determines if the defendants' negligence was the proximate cause of any injury to plaintiff's decedent in this case.

The record contains expert opinions from a witness for plaintiff opining that these defendants did, in fact, breach the standard of care in treating Eileen Schrader. It also includes witnesses for the defendants concluding that there was no breach of the standard of care. Therefore, an obvious jury question is involved in this case on the negligence issue in which the jury was called upon to decide. Since there were no special interrogatories for the jury to answer on this first issue, the verdict in this case is susceptible to an interpretation that the jury answered the negligence issue in the negative.

The rebuttal witnesses that Schrader desired to call were for the purpose of rebutting the "sudden death" defense propounded by the defense. This "sudden death" defense would obviously only come into play on the second issue the jury was called on to decide, namely, proximate cause. Under the record, it is impossible to determine whether or not the jury ever reached the proximate cause issue since, as previously stated, a no answer to the negligence issue means the jury stops there and need not even consider the second issue.

Under the unfortunate occurrence in this case, it would be easy to disregard precedent in this appeal, but in construing jury verdicts "a construction which sustains the [jury] verdict must be applied." *Bankwest, Inc. v. Valentine*, 451 N.W.2d 732, 736 (S.D.1990). Therefore, I would affirm the jury verdict on issue one since I am unable to conclude that rebuttal witnesses would probably have changed the jury verdict.

I concur on issues two and three.