1996 SD 130

**Merle HABERER and Carney Haberer, Plaintiffs and Appellants,**

v.

**RADIO SHACK, A DIVISION of TANDY CORPORATION; and Brick's TV & Appliance Repair, Defendants and Appellees.**

No. 19251.

Supreme Court of South Dakota.

Considered on Briefs March 14, 1996.

On Reassignment Aug. 23, 1996.

Decided Oct. 30, 1996.

Rick Johnson of Johnson, Eklund, Nicholson and Dougherty, Gregory, for plaintiffs and appellants.

Reed Rasmussen of Siegel, Barnett and Schutz, Aberdeen, for appellee Radio Shack.

Chester A. Groseclose of Richardson, Groseclose, Wyly, Wise and Sauck, Aberdeen, for appellee Brick's.

GILBERTSON, Justice (on reassignment).

[¶ 1] Carney and Merle Haberer (Haberer) appeal a directed verdict in favor of Brick's TV & Appliance and a jury verdict in favor of Radio Shack. We affirm.

### FACTS & PROCEDURE

[¶ 2] Haberer owned the "Showcase," a bar in Aberdeen, South Dakota. In 1993, Haberer contacted James Schaunaman to install and upgrade a sound system in the bar, using equipment Haberer already owned. Haberer first met Schaunaman as a tenant in the apartment building that Haberer managed. Schaunaman had previously installed smoke detectors in the apartment building and repaired a television set for Haberer. At the time Haberer asked Schaunaman to perform the work at the Showcase, Schaunaman was the owner of Brick's Video, a sole proprietorship having its office in the same building as Brick's TV & Appliance (Brick's TV), which was owned by Larry Brick. Brick's Video provided repair service on VCR's, video equipment, televisions, and audio equipment. Brick's Video and Brick's TV share the same address and telephone number.

[¶ 3] Schaunaman installed the sound system at the Showcase. On June 21, 1993, Schaunaman further installed a battery-operated mixer, the device which combines and distributes the signal between the audio source and the amplifiers. Following some problems with the mixer, Schaunaman suggested and installed a Radio Shack AC adapter between the mixer and a power strip. One and a half days later, there were more problems with the sound system. Schaunaman, believing the lead wires were malfunctioning, exchanged them at Radio Shack. He replaced the lead wires again two days later. On July 2, 1993, Schaunaman installed components in the system, including a "Y" adapter.

[¶ 4] On July 4, 1993, at approximately 3:00 a.m., Kris Jensen, Haberer's employee, was in the Showcase and smelled smoke. Jensen contacted the fire department, which was

unable to contain the fire. The Showcase was completely destroyed.

[¶ 5] Haberer filed suit against Radio Shack and Brick's TV on March 4, 1994. He did not sue Schaunaman, who was doing business as Brick's Video. Haberer served interrogatories March 20, 1995. On April 24, 1995, Radio Shack responded to Haberer's interrogatory regarding expert witnesses by sending Haberer a list of expert witnesses which included E.P. Hamilton, III. Radio Shack stated these experts would testify regarding the source of the fire and that "Dr. Hamilton has concluded that neither the mixer nor the adapter sold by Radio Shack could have been the cause of the fire." The answers indicated Radio Shack's experts relied on physical evidence including the fire scene itself, the adapter removed from the scene, and undamaged mixers and adapters similar to those involved in the fire.

[¶ 6] At trial, lay witnesses and expert witnesses testified regarding the fire's origin. Haberer's witnesses testified the fire started in the stage area which held the sound system and then spread to the basement through a hole caused by the malfunctioning Radio Shack equipment. Radio Shack's experts testified the fire started in the basement and that there were multiple points of origin.

[¶ 7] Prior to trial, the trial court had denied a motion for summary judgment made by Brick's TV based on apparent or ostensible agency. At the close of Haberer's evidence, however, the trial court on its own motion directed a verdict for Brick's TV. The jury returned a verdict in favor of Radio Shack. Haberer appeals, seeking a reversal of the directed verdict and a new trial against both Brick's TV and Radio Shack.

## ANALYSIS & DECISION

[¶ 8] **1. Whether the trial court erred in granting a directed verdict to Brick's TV?**

[¶ 9] The agency issue presents a two-pronged question. The first prong is whether a question of fact exists regarding ostensible agency between Brick's TV and Schaunaman. The second prong is whether a question of fact exists regarding reliance by Haberer upon that ostensible agency. The evidence of this case establishes there is a question of fact as to the existence of an agency relationship between Brick's TV and Schaunaman. There has been no showing, however, of reliance by Haberer in this regard. Thus, Haberer fails on this second prong.

[¶ 10] In reviewing a trial court's decision to grant a directed verdict pursuant to SDCL 15-6-50(a), we will presume the determination of the trial court to be correct and will not seek reasons to reverse. *Sabag v. Continental South Dakota*, 374 N.W.2d 349, 355 (S.D.1985). Upon a motion for a directed verdict, the trial court must determine whether there is "substantial evidence" to allow Haberer as the plaintiff to continue with his cause of action. *Haberer v. Rice*, 511 N.W.2d 279, 284 (S.D.1994). Thus, for Haberer to establish "substantial evidence" upon the reliance issue, he must bring forth facts to show he either commenced or continued his business relationship with Schaunaman based on a reliance on Schaunaman's ostensible agency with Brick's TV. Such evidence is totally lacking from the record, including Haberer's own testimony which supports a contrary conclusion. With no evidentiary dispute, reasonable minds could not differ and a directed verdict was appropriately granted. *BankWest, Inc. v. Valentine*, 451 N.W.2d 732, 734 (S.D.1990).

[¶ 11] The record reflects Haberer's initial contact with Schaunaman was through their acquaintance as tenants at the apartment complex Haberer managed. Haberer and Schaunaman became friends and Haberer hired Schaunaman to do some repair work for him personally on a television set and for the apartment complex installing smoke alarms. This work was done approximately six months prior to Haberer's hiring Schaunaman to work on the sound equipment at the Showcase. Haberer testified when he needed the work done at the Showcase, "I thought of Mr. Schaunaman and Schaunaman and I are real good friends. I hope we still are, but we were real good friends. And he came down and I asked him, could you make, you know, a music system out of this?"

[¶ 12] SDCL 59–6–3 provides that "[a] principal is bound by acts of his agent under ostensible authority, to those persons only who have in good faith, and without negligence, incurred a liability or parted with value upon the faith thereof." As long ago as 1929, this Court held that the third party's "knowledge of and reliance upon circumstances tending to show agency" was a prerequisite to the admission into evidence of those circumstances if the third party was claiming ostensible agency. *McKean Auto Co. v. O'Marro*, 54 S.D. 435, 439, 223 N.W. 354, 356 (1929); *see also Karlen v. Butler Mfg. Co.*, 526 F.2d 1373, 1378 (8th Cir.1975) (applying South Dakota law). More recently, we stated "[t]he third person dealing with the agent, therefore, must show not only damages resulting from his reliance on the appearance of authority, but also reasonable diligence and prudence in ascertaining the fact of the agency and the nature and extent of the agent's authority." *Dahl v. Sittner*, 429 N.W.2d 458, 462 (S.D.1988) (citing 3 AmJur2d *Agency* §§ 80, 83 at 587, 592–93 (1986)).

[¶ 13] Haberer has offered no evidence that he relied on any "circumstances tending to show agency" between Schaunaman and Brick's TV & Appliance when Haberer hired Schaunaman to do work on the sound equipment at the Showcase.[1] Haberer freely admitted that he hired Schaunaman because Schaunaman was a good friend of his and did good work. On cross-examination by Brick's TV, Haberer testified to the following:

Q: And you hired Jim Schaunaman because you knew him and you liked him; isn't that correct?

A: Jim's a fine man.

---

1. As mentioned previously, Haberer testified he first met Schaunaman at the apartment building where Haberer was the manager and Schaunaman, a tenant. Haberer further testified that, at that time, Schaunaman worked for Aberdeen TV & Appliance. Schaunaman and Haberer struck up a friendship. It was while Schaunaman was with Aberdeen TV & Appliance that Haberer asked Schaunaman to repair his television set. Haberer contacted Schaunaman about this job at the apartment complex and talked to him personally. Haberer also asked Schaunaman to do some repair work on a fire alarm system. Fol-

Q: And the work that he had done earlier for you was entirely satisfactory, wasn't it?

A: Very much so.

[¶ 14] Haberer did not hire Schaunaman through Brick's TV or because Haberer thought Schaunaman was a Brick's TV employee, but rather because Schaunaman and he were friends from their prior associations at the apartment complex. This friendship, as the basis for Haberer's ongoing use of Schaunaman's services, continued through the date of the fire. The fact Haberer came to know that his friend Schaunaman may be an agent of Brick's TV after Haberer had initially hired Schaunaman never affected their business relationship. Haberer continued to hire Schaunaman because they were friends, and because Schaunaman did good work. Haberer would have called Schaunaman to fix the electrical problem at the Showcase no matter where Schaunaman could be found. Thus, Haberer has failed to offer substantial evidence of any circumstances which would attach liability to Brick's TV & Appliance. "Oratory and arguments of counsel, however eloquent, are not an evidentiary basis to avoid an unfavorable disposition of the case." *Cody v. Leapley*, 476 N.W.2d 257, 265 (S.D.1991) (citing *Estes v. Millea*, 464 N.W.2d 616, 619 (S.D.1990)).

[¶ 15] **2. Whether the trial court erred in not limiting the testimony of expert witnesses for Radio Shack?**

[¶ 16] Haberer claims Radio Shack's expert, Hamilton, testified beyond the scope of the interrogatory responses and that Radio Shack should have supplemented its responses when it had more information regarding its expert.[2]

---

lowing Schaunaman's employment with Aberdeen TV & Appliance, he managed a fried chicken franchise, and following that, he went to Brick's Video. After Schaunaman could be contacted at Brick's Video, Haberer stated that the next time he needed help, Schaunaman was the first person who came to mind.

2. Haberer also claims error in the admission of Rallis' testimony, but no objection was raised at the trial court. Objections must be made to the trial court in order to allow it to correct mistakes, and an objection not properly raised below

[T]rial courts have broad discretion concerning the admission of expert testimony. The trial court's evidentiary rulings are presumed correct and will not be reversed unless there is a clear abuse of discretion. We have held that an abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence. SDCL 15–6–37 gives the trial judge broad latitude in penalizing the party who has failed to comply with discovery orders, however such latitude is not limitless.

*Schrader v. Tjarks,* 522 N.W.2d 205, 209 (S.D.1994) (internal citations and quotations omitted).

[¶ 17] Haberer claims Radio Shack should have supplemented its answers when it knew the basis of Hamilton's testimony. SDCL 15–6–26(b)(4)(A)(i) provides that:

A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

SDCL 15–6–26(e)(1)(B) imposes a duty upon a party to supplement the above.

[¶ 18] Haberer claims Hamilton exceeded the scope of Radio Shack's discovery answers when he expressed certain opinions, including the temperature to which the adapter was exposed during the fire, the Underwriters Laboratory standards and system of testing, the cause of the problems with the audio wires and "Y" connectors, and that the mixer and adapter were not defective. Haberer did not make this objection at trial. Objections must be made to the trial court in order to allow it to correct mistakes, and an objection not properly raised at trial cannot be reviewed by this Court on appeal. *Kelley,* 513 N.W.2d at 110; *Anderson,* 441 N.W.2d at 677.

[¶ 19] Haberer also claims Hamilton exceeded the scope of interrogatory responses when he testified to the basis of his opinion that the mixer and adapter did not cause the fire. Hamilton testified he personally performed testing, relied on prior testing results, examined technical and purchasing materials at the Tandy headquarters (Radio Shack's parent company), and familiarized himself with the devices and their specifications. Haberer claims prejudice by not knowing the basis of Hamilton's opinion. He claims he could not request copies of the manuals and test results in order to prepare his own expert. Haberer objected to Hamilton's opinion and its basis, stating "the only opinion that this man can give in this case is that which was disclosed, that neither the mixer nor the adapter sold by Radio Shack would have been the cause of the fire[.]" The trial court overruled the objection because there had been "broad disclosure" through the answers to the interrogatories. The trial court later denied a motion for a new trial on this issue.

[¶ 20] Prohibition of evidence offered by a party who has not complied with the discovery rules " 'is designed to compel production of evidence and to promote, rather than stifle, the truth finding process.' " *Schrader,* 522 N.W.2d at 210 (quoting *Magbuhat v. Kovarik,* 382 N.W.2d 43, 45 (S.D. 1986)). "Imposing a sanction such as the exclusion of the testimony should result when 'failure to comply has been due to ... willfulness, bad faith, or ... [fault].' " *Id.* (quoting *Chittenden & Eastman Co. v. Smith,* 286 N.W.2d 314, 316 (S.D.1979)). "[D]rastic sanctions under Rule 37 are not authorized when 'the failure to comply is the result of inability rather than willfulness or bad faith.' " *Id.*

[¶ 21] Haberer claims Radio Shack's failure to comply with discovery constitutes willfulness. Haberer's interrogatories were dated March 20, 1995. Radio Shack answered the interrogatories on April 24, 1995, just one week before trial began on May 1, 1995. Haberer claims it was likely Radio Shack knew Hamilton had traveled to Tandy headquarters and conducted testing to form his opinion at the time of the answers. Howev-

cannot be reviewed by this Court on appeal. *City of Sioux Falls v. Kelley,* 513 N.W.2d 97, 110 (S.D.1994); *Anderson v. Johnson,* 441 N.W.2d 675, 677 (S.D.1989).

er, Hamilton's testing was covered by Radio Shack's answer. Haberer had notice, through the answers, that Hamilton would testify that the mixer and adapter could not have been the cause of the fire and would base at least part of his testimony on "undamaged mixers and adapters similar" to the items in the fire. It is logical that Hamilton would have examined and tested such equipment in order to draw his conclusions. It is also logical that Hamilton would have a basis for his opinion.

[¶ 22] The only information Radio Shack failed to disclose was that Hamilton made the trip to Tandy headquarters and made tests. "The severity of the sanction must be tempered with consideration of the equities. Less drastic alternatives should be employed before sanctions are imposed which hinder a party's day in court and thus defeat the very objective of the litigation, namely to seek the truth from those who have knowledge of the facts." *Magbuhat,* 382 N.W.2d at 45 (citations omitted). Haberer essentially requested that all of Hamilton's factual bases be withheld from the jury. Such drastic measures are not warranted by the situation.

[¶ 23] When presented with answers believed to be vague and unresponsive, Haberer could have moved the trial court to order further discovery pursuant to SDCL 15–6–26(b)(4)(A)(ii) or could have moved for a continuance to further discover Hamilton's opinion and its basis. Haberer did neither and the trial court chose to admit Hamilton's testimony. Haberer did not show the trial court abused its discretion in admitting the testimony.

[¶ 24] We affirm.

[¶ 25] AMUNDSON and KONENKAMP, JJ., concur.

[¶ 26] MILLER, C.J., and SABERS, J., concur in part and dissent in part.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 27] **The trial court erred in granting a directed verdict to Brick's TV.**

[¶ 28] Haberer claims Schaunaman was an ostensible agent of Brick's TV and that the trial court erred in granting a directed verdict to Brick's TV.

> Upon [a motion for a directed verdict], the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.

*Bauman v. Auch,* 539 N.W.2d 320, 325 (S.D. 1995) (citing *Sabag v. Continental South Dakota,* 374 N.W.2d 349 (S.D.1985)).

[¶ 29] The trial court stated there was no ostensible agency because Merle did not rely on Brick's representations. There are really two questions involved. First, whether Schaunaman was an ostensible agent of Brick's TV and second, whether Merle relied on the relationship to his detriment.[3] Since the majority opinion concedes the first, we consider the second question.

[¶ 30] Schaunaman's business, called Brick's Video, shared the same office and telephone number as Brick's TV. Merle was previously billed for smoke detectors and a television with statements from Brick's Video, with the same address and telephone number. Merle testified when he wanted to reach Schaunaman, he called Brick's. Schaunaman testified the telephone was answered "Brick's TV," whether Schaunaman or Brick answered. Further, Merle testified Schauna-

---

3. *See* Restatement (Second) Agency § 265 (1957), which provides:

(1) A master or other principal is subject to liability for torts which result from reliance upon, or belief in, statements or other conduct within an agent's apparent authority.

(2) Unless there has been reliance, the principal is not liable in tort for conduct of a servant or other agent merely because it is within his apparent authority or apparent scope of employment.

man told Merle he "was connected with" Brick's Video.

[¶ 31] Once an ostensible agency is determined, as here, the principal is liable for the acts of his agents only to those who have "in good faith, and without negligence, incurred a liability or parted with value upon the faith thereof."[4] SDCL 59–6–3.

[¶ 32] The trial court stated that Merle presented only limited evidence before the jury and that the only "thing[s] that bothered the court" were two prior statements from Brick's Video, and that Merle had not even stated he looked at the statements. However, Merle testified more fully that he owned stereo equipment and did not want to pay for a new sound system:

A: So then I thought of Mr. Schaunaman and Schaunaman and I are real good friends. I hope we still are, but we were real good friends. And he came down and I asked him, could you make ... a music system out of this?

Q: Now Mr. Schaunaman, he'd done work for you before?

A: Yes.

Q: And let's see ... he's done good work for you in the six months prior to that?

A: Yes.

Q: *And did you know where he was operating out of?*

A: At the time—at this time?

Q: Yes.

A: *Yeah. At this time I did, yes.*

Q: All right. And where—and when he would bill you for his work, where—under what name did he bill you? ...

A: Brick's Video....

Q: ... And when you wanted to call Mr. Schaunaman while you were working on this stereo system, where would you call him? ...

A: At Brick's Video.

Q: And he would answer the phone?

A: Once he would answer it and the other time I think Mr. Brick would answer....

Q: ... But did you call out there at that number?

A: Yes.

Q: And did you think he was connected with Brick's Video? ...

A: Yes, he told me he was.

(Emphasis added.)

[¶ 33] After the system broke down, Merle " ... called Jim or I called out to Brick's. I can't remember if I talked to Jim or who I talked to and I said it quit."

[¶ 34] As indicated, Merle was previously billed with statements from Brick's Video, with the same address and telephone number as Brick's TV.[5] Merle testified:

Q: [Y]ou were making a point of it, were you, that the address of Brick's Video on here was something that you were looking at? ...

A: Well, if I did, I did. I don't know.

Q: But you testified at your deposition, did you not, that you never saw those bills? ...

A: If I did, I was probably confused. I don't know.

---

4. Restatement (Second) Agency § 267 (1957) provides:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

The comments accompanying § 267 provide, in relevant part: "The mere fact that acts are done by one whom the injured party *believes* to be the defendant's servant is not sufficient to cause the apparent master to be liable. *There must be such reliance upon the manifestation as*

*exposes the plaintiff to the negligent conduct." Id.* § 267, cmt a (emphasis added). However, this latter question should not be reached where, as here, a genuine issue of material fact exists as to reliance and reasonable minds can differ.

5. On March 28, 1994, 24 days after this lawsuit was filed, Schaunaman filed a "fictitious name" certificate claiming to be the sole owner of Brick's Video. The trial court did not allow this evidence before the jury because Merle did not rely on it prior to the fire. However, it supports, rather than detracts, from the argument that there is a genuine issue of material fact and reasonable minds can differ.

Q: So you think that you did see those bills?

A: I don't know.

This testimony does not eliminate questions whether Merle relied upon his knowledge that Schaunaman worked at Brick's. Merle had already testified he knew Schaunaman worked at Brick's. Although he did not complain to Brick's when the building burned, he and Schaunaman went to Brick's to disassemble a mixer like the one Merle thought might have caused the fire.[6]

[¶ 35] Merle testified regarding his reasons for hiring Schaunaman:

Q: [Y]ou hired Jim Schaunaman because you knew him and you like him, isn't that correct?

A: Jim's a fine man.

Q: And the work that he had done earlier for you was entirely satisfactory, wasn't it?

A: Very much so.

[¶ 36] Merle did not indicate he hired Schaunaman only because they were friends. In fact, Merle testified he knew Schaunaman worked at Brick's Video when he asked him to assemble the stereo at the Showcase. The satisfactory work Schaunaman did earlier was billed on statements from Brick's Video. While Merle did not make it clear that he hired Schaunaman because Schaunaman worked for Brick's, a jury question is created *if all* legitimate inferences are drawn in Haberer's favor as required. *Bauman*, 539 N.W.2d at 325.

[¶ 37] The question is whether there was sufficient evidence so that reasonable minds could differ. Reasonable minds can differ as to whether Schaunaman was an ostensible agent of Brick's and whether Haberer reasonably relied on this agency to their detriment under these circumstances. The trial court erred in directing a verdict for Brick's TV. Therefore, we should reverse and remand for trial on this issue.

[¶ 38] MILLER, C.J., joins this concurrence in part and dissent in part.

---

6. The majority opinion claims there is "no evidentiary dispute." However, Merle's testimony raises a question of fact, answerable only by the jury, as to his reliance. Although Merle did not use the words, "I relied on Brick's TV," he gave the jury evidence on reliance when he indicated he hired Schaunaman knowing Schaunaman worked at Brick's and after Schaunaman indicated he was connected with Brick's Video.

The majority opinion correctly identifies part of the standard of review: "Upon [a motion for directed verdict], the trial court must determine whether there is substantial evidence to continue the action." *Haberer v. Rice*, 511 N.W.2d 279, 284 (S.D.1994).

At this point in the trial, the court, in making this determination, is not free to weigh the evidence or gauge the credibility of the witnesses. *Denke v. Mamola*, 437 N.W.2d 205, 207 (S.D.1989); *Baldwin v. First Nat. Bank of Black Hills*, 362 N.W.2d 85 (S.D.1985). *The trial court, as well as this court on appeal, must view the evidence in a light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the evidence. Denke,* 437 N.W.2d at 207; *Carlson v. First Nat. Bank,* 429 N.W.2d 463, 466 (S.D.1988); *Kreager v. Blomstrom Oil Co.,* 379 N.W.2d 307 (S.D.1985). If, when so viewed, there is any substantial evidence to sustain the cause of action or defense, *it must be submitted to the jury. Denke, supra; Baldwin, supra.*

*Id.* (emphasis added).